**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kevin Joseph BAUTISTA,**
**Defendant–Appellant.**

No. 02–50664.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 2003.

Filed March 26, 2004.

Timothy A. Scott, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney, Mark A. Inciong, Assistant United States Attorney, United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before: REINHARDT, FERNANDEZ, and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge.

Using only a personal computer, ordinary software, and a color ink jet printer, Kevin Bautista manufactured approximately $7,000 in counterfeit currency while staying in room # 332 of the Good Nite Inn in San Diego, California. It was not Bautista's counterfeiting operation that led the police to his motel room, however. It was the credit card used to reserve the room. Upon being informed that the card was stolen, the motel's manager called the San Diego Police, who searched Bautista's room with the ostensible consent of Bautista's wife. The search led to the discovery of Bautista's computer software as well as partially printed federal reserve notes, several counterfeit bills, and additional papers with counterfeited watermarks and security bands. Bautista was apprehended away from the motel. As a result of police questioning, Bautista gave a full and detailed confession.

Bautista was indicted for manufacturing counterfeit currency, in violation of 18 U.S.C. § 471. He filed a motion to suppress the evidence obtained during the search of his motel room and the statements he made while in custody. Both motions were denied and Bautista entered a conditional guilty plea, preserving the two issues for appeal.

We must now determine whether a registered occupant of a motel room retains a legitimate expectation of privacy in the face of an unconfirmed report that a stolen credit card number was used to reserve the room. If so, the police officer's entry into the motel room was a warrantless intrusion, unsupported by probable cause, which was not salvaged by Mrs. Bautista's subsequent consent to entry. We must also address Bautista's contention that his confession, although preceded by *Miranda* warnings, was nevertheless involuntary.

Having considered our admittedly scant precedent, we conclude that, because Bautista was not evicted from his motel room by the manager, he retained a legitimate expectation of privacy at the time of the warrantless entry by the police. Because the entry was not supported by probable cause, Mrs. Bautista's consent to the entry did not remedy the Fourth Amendment violation. Accordingly, we vacate the district court's denial of Bautista's motion to suppress the evidence obtained during the search of the motel room, and remand for further proceedings.

Because it was not clearly erroneous for the district court to determine that Bautista's testimony was not credible, the custodial questioning of Bautista does not raise a legitimate specter of involuntariness. Therefore, we affirm the district court's denial of Bautista's motion to suppress the statements he made while in custody.

## I. BACKGROUND

### A. Motel Room Search

On April 29, 2002, Room # 332 of the Good Nite Inn in San Diego, California was reserved in Bautista's name. The reservation, made through www.lodging.com with a Visa credit card, was for six nights and listed Bautista as the sole guest. Bautista checked into the room that same day.

A few days later, a representative from www.lodging.com called the motel manager, and informed her that the credit card used to make Bautista's reservation was stolen, with the owner of the card disputing the charges. The manager called the San Diego Police Department, and Officers Novasky and Thomas responded. When

the officers arrived, the manager gave them Bautista's registration information and showed them, on a site map, the location of room #332.[1] This was the first time the manager had been confronted with a stolen credit card number used to make a room reservation. Her "intent was for the police to find out what was going on with Mr. Bautista and the credit card." If Bautista could not "explain the credit card situation" to the manager's satisfaction, she was prepared to have the police "evict him unless[she] could make other payment arrangements with him." The manager was aware that, when faced with guests who stayed past checkout time, the motel would first call the guest and attempt to negotiate payment before resorting to eviction. Applying the motel's existing policy to this new situation, the manager asked the police to investigate the matter, rather than to evict Bautista.

By the time the police arrived, Bautista's car was no longer in the parking lot, and it appeared that he had left. However, the manager learned from a motel housekeeper that a woman was in Bautista's room. The manager gave the officers a "100 key." According to the manager, a "100 key" is a pass key that "would allow [the police] to enter any outside building doors of the motel" but "would not allow them to open any of the guest rooms including room #332." [2]

The officers made their way to room #332 and knocked on the door. A female voice asked, "Who is it?" The officers identified themselves; told the woman that they needed to speak with her; and requested that she open the door. Rather than open the door, the woman again inquired who was at the door. The officers identified themselves a second time. Again, no one opened the door. Officer Novasky then inserted the pass key provided by the manager. Although Officer Novasky inserted the key and the key, in fact, unlocked the door, it was Mrs. Bautista who actually opened the door to the room.[3]

When the door opened, Mrs. Bautista said nothing. Indeed, although Officer Novasky asked for her name, she simply stood there, seemingly frozen, and neither responded to the officers nor invited them inside the room. Officer Novasky tried again, asking the woman who was in the room; asking for her name; and telling her about the stolen credit card report. The woman then identified herself as Tracy Bautista. Although Mrs. Bautista did not attempt to close the door on the officers, she did back up, which forced Officer Novasky to place a foot on the edge of the door to hold it open. Before the officers asked Mrs. Bautista if they could enter the room, she told them to "come in," at the same time as she backed away from the door.

Once inside the room, both officers stood in full uniform, their guns visible on their hips, while Mrs. Bautista sat on the bed. Two children, a four-year old and an eighteen-month old, were also in the room. Officer Novaksy espied a computer on a desk—with the user name "money" on the

---

1. The officers were dispatched solely to investigate the incident. They had made no determination regarding whether Bautista had committed credit card fraud.

2. During the suppression hearing, Officer Novasky testified that he used the pass key on the door to room #332 and that the key unlocked the door. Given his unambiguous testimony that the pass key unlocked the door, the manager's belief that the pass key would not allow the police to open any of the guest rooms appears to have been mistaken.

3. Officer Novasky's unlocking of the door and Mrs. Bautista's opening of the door occurred almost simultaneously.

screen—and a backpack under the desk. No counterfeit money or contraband was in plain view. Officer Thomas asked Mrs. Bautista if they could search the room for illegal drugs or other contraband, and she answered: "Yes, go ahead."

Inspection of the room revealed a computer software CD labeled "Kev's $", several partially printed bills in the printer feed tray, several counterfeit $20 and $50 bills, and additional papers with counterfeited watermarks and security bands. Mrs. Bautista told the officers that their essentially homeless family had run out of money, and a man named "Ray" reserved the room at the Good Nite Inn for them.[4] The police were subsequently able to locate and apprehend Bautista. When arrested, Bautista had $340 in counterfeit currency in his possession.

### B. Bautista's Confession

Bautista was questioned by Secret Service agents in a police station interview room. Neither agent was armed and Bautista's handcuffs were removed. Both agents were aware that Mrs. Bautista was en route to the police station and that the couple had two small children. According to Bautista, the agents began by stating: "If you want to . . . let us know what happened, now is the time to tell us because, if you don't do it now, we don't know where it's going to go and what will happen to you and your family." The agents told Bautista that his wife could go to Las Colinas and his children to Polinsky if Bautista did not let them know what was going on.[5] Bautista perceived the agents'

remarks as threats, and only agreed to speak with the agents to protect his family. The agents read Bautista his *Miranda* rights, which Bautista waived before giving detailed oral and written confessions. The interview lasted approximately twenty to twenty-five minutes.

The agents dispute Bautista's account of the interview. According to them, Bautista was cooperative and "more than willing" to volunteer information without being asked. The agents insisted that they did not make any threats or promises during the interview. They also testified that it was Bautista, not they, who first introduced his wife's name into the conversation and that he did so to exculpate her as quickly as possible.

### C. District Court Proceedings

The government filed an indictment charging Bautista with "manufacturing counterfeit obligations" in violation of 18 U.S.C. § 471. Bautista filed a motion to suppress the evidence obtained during the search of his motel room and to suppress his confessions. After the district court denied the motion, Bautista entered a conditional guilty plea that allowed him to appeal the district court's denial of his motion to suppress. Following sentencing, Bautista filed a timely notice of appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARDS OF REVIEW

 A district court's denial of a motion to suppress evidence is reviewed *de*

---

**4.** The police later discovered that Bautista's friend, Rhansom "Ray" Ramos, was staying at the same motel, and that his room had been reserved using the same stolen credit card.

**5.** "Las Colinas" is short for the Las Colinas Detention Facility near San Diego, which

houses female arrestees. *See* http://www.sdsheriff.net/lcdf/index.html (last visited February 17, 2004). "Polinksy" is the Polinsky Children's Center, an emergency shelter for abused, abandoned, and neglected children in San Diego. *See* http://www.wic.org/orgs/polinsky.htm (last visited February 17, 2004).

novo. *See United States v. Silva,* 247 F.3d 1051, 1054 (9th Cir.2001). Whether or not an individual's expectation of privacy was objectively reasonable is also reviewed *de novo. See United States v. Nerber,* 222 F.3d 597, 599 (9th Cir.2000).

■■■ The government has the burden of proving that consent to a search was voluntary, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and must do so by a preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Whether or not consent was voluntary is determined from the totality of all the circumstances. *See Pavao v. Pagay,* 307 F.3d 915, 919 (9th Cir.2002). Notably, however,"the government's burden to show voluntariness cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *United States v. Perez–Lopez,* 348 F.3d 839, 846 (9th Cir.2003) (citation and internal quotation marks omitted).

■■■ "The government must prove that a confession[was] voluntary by a preponderance of the evidence." *United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981) (citation omitted). This Court reviews *de novo* "the voluntariness of a criminal suspect's statements to law enforcement officers." *United States v. Okafor,* 285 F.3d 842, 846–47 (9th Cir.2002). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.2003).

## III. DISCUSSION

### A. Motel Room Search

#### 1. Bautista's Expectation of Privacy

■■■ It is well-settled that "[t]he Fourth Amendment protection against unreasonable searches and seizures is not limited 3790 to one's home, but also extends to such places as hotel or motel rooms." *United States v. Cormier,* 220 F.3d 1103, 1108–09 (9th Cir.2000) (citation omitted). "To invoke the protections of the Fourth Amendment, a person must ... demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was one that society is prepared to recognize as reasonable." *Nerber,* 222 F.3d at 599 (citations and internal quotation marks omitted). Having made that showing, an individual is protected by the Fourth Amendment from warrantless searches in the absence of probable cause. *See United States v. Alaimalo,* 313 F.3d 1188, 1193 (9th Cir.2003); *see also Bailey v. Newland,* 263 F.3d 1022, 1029–1030 (9th Cir.2001).

■■■ The absence of a right to exclude others from access to a situs is an important factor militating against a legitimate expectation of privacy. *See Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Consequently, we have held that if a hotel guest's rental period has expired, or has been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room. *See, e.g., United States v. Haddad,* 558 F.2d 968, 975 (9th Cir.1977) (observing that "a justified ejection is no different than a termination of the rental period, when the guest has completely lost the right to use the room and any privacy associated with it") (citations and internal quotation marks omitted).

Bautista's rental period had yet to expire when the police searched his room. According to our precedent, unless his occupancy had been lawfully terminated when the police conducted their search, Bautista retained a reasonable expectation of privacy in the room. The critical determination is whether or not management had justifiably terminated Bautista's control of the room through private acts of dominion. *Id.; see also United States v. Dorais*, 241 F.3d 1124, 1127–28 (9th Cir. 2001) (holding that a hotel guest no longer had a reasonable expectation of privacy in a room when the staff had taken "affirmative steps" to remove him).

It is undisputed in this case that the motel's manager took no affirmative steps to repossess the room once she learned that it had been reserved with a stolen credit card. To the contrary, she simply asked the police to investigate the matter, and would have evicted Bautista only if he later failed to provide either a satisfactory explanation or another form of payment. Pursuant to the motel's "generally lax practices," *see id.* at 1128, the manager did not ask the police to evict Bautista. Rather, the motel continued to recognize Bautista's privacy rights, and planned to do so until Bautista had the opportunity to speak with management. The government's argument that Bautista's eviction was "inevitable" misses the point. Bautista was still in possession of the room when the police entered and searched the premises, and that is the point in time when we deter-mine the existence of any Fourth Amendment violation.[6] *See United States v. Henderson*, 241 F.3d 638, 647 (9th Cir. 2001).

The cases relied upon by the district court in reaching a different conclusion presented more compelling facts militating against a reasonable expectation of privacy. In *People v. Satz*, 61 Cal.App.4th 322, 71 Cal.Rptr.2d 433 (1998), the defendant used a stolen credit card number to register as a guest at a motel. When confronted by the motel's manager, the defendant admitted she had no money to pay for the room. *Id.* at 326, 71 Cal.Rptr.2d 433. Rather than requesting that the police look into the situation, the manager specifically asked that they assist her in evicting the defendant. *Id.* at 324, 71 Cal.Rptr.2d 433. The manager took justifiable affirmative steps to repossess the room and, as a result, the defendant no longer had a reasonable expectation of privacy there. *See Dorais*, 241 F.3d at 1127–29.

In this case, neither the motel's manager nor the police had reached a conclusion that Bautista had fraudulently procured the room. The manager did not ask the police to evict Bautista and the police did not suggest doing so. While Bautista, in effect, had yet to pay for the room, the manager did not know that he *could not* pay for the room. Until she made that determination and asked the police to evict Bautista, he was still a lawful occupant who retained a legitimate expectation of privacy in the room. *See id.*[7]

6. The government never asserted that the officers had probable cause to search the motel room.

7. The other cases relied upon by the district court are also distinguishable. In *United States v. Wai–Keung*, 845 F.Supp. 1548 (S.D.Fla.1994), *aff'd*, 115 F.3d 874 (11th Cir. 1997), the defendants did not have a legitimate expectation of privacy when the Secret Service agents searched their rooms because they had constructively abandoned the room by failing to leave any luggage; they were not authorized guests of the person in whose name the rooms were rented; it was hours after the rental period terminated even assuming the hotel had extended late check-out privileges; and information provided by the agents gave the hotel management good cause to evict them. *United States v. Diaz*, Nos. 1998–42, 1998–43, 1998 WL 635849 (D.Vir-

In contrast to the cases relied upon by the district court, neither the motel manager nor the police knew whether Bautista had obtained the room by fraud. No investigation had yet been conducted, and no cause for ejection had been developed. Bautista still had two days remaining on his reservation and the motel had taken no affirmative steps to repossess the room. Consequently, Bautista still had the right to exclude others from the room as well as "a legitimate expectation of privacy by virtue of this right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In the absence of directly controlling authority, the district court understandably applied out-of-circuit authority reflecting somewhat analogous facts. However, we are persuaded that our analysis in *Dorais* controls.

## 2. Mrs. Bautista's Consent to Entry

■ Officer Novasky acknowledged that he essentially stated: "San Diego police. Open the door." When viewed in light of our decision in *United States v. Winsor*, 846 F.2d 1569, 1573 (9th Cir.1988) (en banc), Mrs. Bautista's actions after the officer's demand cannot be deemed consensual.

In *Winsor*, the police entered a hotel and conducted a room-to-room search for a robbery suspect. *Id.* at 1571. At each room, the police knocked on the door and announced: "Police. Open the door." *Id.* When they knocked on the door to the defendant's room and demanded that it be opened, the defendant's brother obeyed. The police recognized the defendant's brother as the robbery suspect, entered the room, and found the defendant as well as evidence of the robbery. *Id.* The defen-

dant argued that the police conducted a non-consensual search of his room "when they knocked on the door and commanded that it be opened under claim of lawful authority." *Id.* at 1572. We agreed, ruling that "the police [effected] a search when they gained visual entry into the room through the door that was opened at their command." *Id.* at 1573 (internal quotation marks omitted). We expressly rejected the government's argument that the search could be sustained on the basis of consent because the defendant's brother "voluntarily" opened the door. *Id.* at 1573 n. 3. (citation omitted). "On these facts," we held, "there can be no consent as a matter of law." *Id.* (citations omitted).

A similar conclusion is warranted in this case, as Mrs. Bautista opened the door in response to a police demand. Furthermore, Mrs. Bautista said nothing when the door first opened. When Officer Novasky asked for her name, she simply stood there, seemingly frozen, and neither responded to the officers nor invited them inside the room. Although she did not attempt to close the door on the officers, she did back up, which forced Officer Novasky to place a foot on the edge of the door to hold it open. Mrs. Bautista's action, or, more precisely, inaction, cannot establish consent. "[T]he government may not show consent to enter from the defendant's failure to object to the entry." *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir.1990). "To do so would be to justify entry by consent and consent by entry. This will not do." *Id.* (citation and internal quotation marks omitted). Mrs. Bautista did invite the officers into the room as she backed away from the door. This "invitation," however, must be viewed in light of the officer's actions that preced-

gin Islands Sept. 10, 1998) involved a search of a hotel room subsequent to a lawful arrest, which constitutes a limited exception to the

Fourth Amendment prohibition against warrantless searches. *See Rawlings*, 448 U.S. at 111, 100 S.Ct. 2556.

ed it, rather than in a vacuum, and cannot fairly be portrayed as voluntary consent to the officer's entry. *See Winsor*, 846 F.2d at 1573 n. 3. (holding that "compliance with a police demand is not consent") (citations, internal quotation marks and alteration omitted).

### 3. Mrs. Bautista's Consent to Search

■ Although Mrs. Bautista told the police they could search the room, "[u]nder the Fourth Amendment ... evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding ... consent, unless subsequent events have purged the taint." *United States v. Chavez–Valenzuela*, 268 F.3d 719, 727 (9th Cir.2001), *amended by*, 279 F.3d 1062 (9th Cir.2002) (citations omitted). "In determining whether the taint has been sufficiently purged, we ask whether, granting establishment of the primary illegality, the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (citation, internal quotation marks, and alteration omitted). Factors to be considered in answering this question include "temporal proximity between illegality and consent and the presence of intervening circumstances." *Id.*

The government points to no "significant intervening time, space, or event" between the officer's illegal entry and Mrs. Bautista's consent. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir.2002) (citation omitted). In other words, "[t]he government has not shown that there was a break in the chain of events sufficient to refute the inference that the search and the resulting seizure ... were products of the [entry]." *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir.2000) (citation omitted). Consequently, Mrs. Bautista's consent was tainted and the evidence ob-

tained pursuant to it should have been suppressed. *See id.; see also United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1127 (9th Cir.2002).

### B. Bautista's Confession

■ After he was arrested and taken into custody, Bautista was placed in an interview room and questioned by Secret Service agents. Neither agent was armed and Bautista's handcuffs were removed. According to Bautista, the agents began the interrogation by stating: "If you want to ... let us know what happened, now is the time to tell us because, if you don't do it now, we don't know where it's going to go and what will happen to you and your family." The agents did not explicitly state that failure to cooperate would necessarily lead to the detention of Bautista's wife and the removal of his children. Instead, they told Bautista: "If you talk to us, we can help you ... but if you don't talk to us, we can't help you." Nevertheless, Bautista perceived the agents' comments as threats, and agreed to speak with them only because of his fears for the welfare of his family. Because of his fears, Bautista contends that his confessions were involuntary. *See Clark*, 331 F.3d at 1072 ("[I]n determining whether a statement was voluntary, the question is whether the defendant's will was overborne at the time he confessed") (citations and internal quotation marks omitted).

Bautista contends that the agents' interrogation tactics are analogous to those utilized in *United States v. Tingle*, 658 F.2d 1332 (9th Cir.1981). In *Tingle*, we found a confession involuntary where the interrogating officer enumerated the suspect's crimes and her possible sentences; told her that he would put in a good word with the prosecution if she cooperated; told her that he would tell the prosecutor she was "stubborn or hard-headed" if she refused;

suggested that her boyfriend had already implicated her; and told her that she would not see her two-year old child again "for a while" if she didn't talk. *Id.* at 1334.

*Tingle* and this case have only one factor in common—according to Bautista, the agents led him to believe that his wife could go to prison and his children to a shelter if he did not speak with them. To Bautista, the choice was clear: "Either I talk and let them know what is going on or I could lose my wife and kids." Given the district court's proper finding that Bautista's testimony was not credible, *Tingle* is clearly inapplicable.

## IV. CONCLUSION

Because Bautista's rental period had not expired and he had not been evicted, he retained a legitimate expectation of privacy in his motel room. His rights under the Fourth Amendment were violated by the warrantless search of his room without probable cause. The officer's command that Mrs. Bautista open the door rendered her actions after that point acquiescence to a claim of lawful authority, rather than the product of freely given consent. No significant intervening time, space, or event provided a buffer between the officer's entry and Mrs. Bautista's subsequent consent to a search of the room, rendering the evidence obtained pursuant to the search tainted by the illegal entry. Accordingly, as Bautista prevailed in part on this appeal from his conditional guilty plea, we **VACATE** Bautista's conviction and **REMAND** to the district court to permit him to withdraw his guilty plea, if he so chooses, and proceed to trial.

The evidence adduced during the suppression hearing demonstrated that Bautista's confession was voluntary. Therefore, the district court's denial of Bautista's motion to suppress the state-

ments he made while in custody is **AFFIRMED**.

**AFFIRMED in part, VACATED in part, and REMANDED.**