**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Peter CUNAG, aka Peter James
Martinez, Defendant–
Appellant.**

**No. 03–50067.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 29, 2004.

Filed June 14, 2004.

William S. Harris, Law Offices of William S. Harris, South Pasadena, CA, for the defendant-appellant.

Pegeen D. Rhyne, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before HALL, TROTT, and CALLAHAN, Circuit Judges.

TROTT, Circuit Judge.

Peter Cunag entered a conditional guilty plea to the charge of possessing stolen mail, reserving the right to appeal the denial of his pre-trial motion to suppress evidence. In that motion, Cunag sought to suppress stolen mail seized by police officers from a hotel room which Cunag had procured by registering under a false name, using a dead woman's credit card, and providing admittedly forged authorization and identification documents. The record contains ample and compelling evidence that Cunag was not lawfully present in the hotel room because he procured it through fraud. Thus, we hold that Cunag had no legitimate expectation of privacy in the room, and we affirm the district court's denial of his motion to suppress the evidence.

## I

## BACKGROUND

According to his own testimony at the suppression hearing, on November 12, 2001, Peter Cunag checked into the Homestead Hotel in Glendale, California under his co-defendant's name, Nelson Aban.[1] Information he gave the hotel included a false address, a false phone number, and a false company name. To pay for the room, he presented a Bank of America credit card in the name of Paciencia Apan, a dead woman. At check-in, the hotel clerk (Miguel Hernandez) told Cunag that he needed proof of his authorization to use Apan's card. Cunag testified that he then left the front desk, proceeded to another location, and knowingly manufactured a fraudulent California Department of Motor Vehicles ("DMV") identification card bearing Apan's name with a man's picture,[2] and two notes purporting to be from Apan. The first note was written on the same page as a photocopy of Apan's credit card. It was addressed to Miguel Hernandez from P. Apan and reads:

> Attached herein is a copy of my Mastercard as requested for use of your office.
> Thanks,
> /s/ Paciencia Apan
> P. Apan
> 818–388 . . .
> Lic. # B981 . . . CA
> Note: This is my personal card. We will issue you a corporate one next day.

The second note was also addressed to Hernandez from P. Apan and reads:

> Attached herewith is a copy of my state CA I.D. for your perusal. Accordingly, I am now responsible for charges incurred by Mr. Aban on Room # 320. I will be responsible & hereby authorize "Ex-

tended Stays" to charge my Bank of America Mastercard from Nov. 14 to Dec. 12, 2001. The charges will encompass room + tax & phone charges only during those dates.
> Thanks,
> /s/ Paciencia Apan
> 11–13–2001

When Cunag returned to the front desk to give the materials to Hernandez, another employee accepted the materials and completed the registration paperwork. The hotel rented Cunag room 320, giving him two keys. Cunag proceeded to the room, brought in his personal belongings, and stayed overnight.

The next day, when Hernandez saw the authorization materials, he notified the hotel manager, Rafael Llamas, that they were "irregular." Llamas examined the documents and noticed that the DMV identification looked fake and the spelling of the name on the credit card did not match the spelling of the name on the DMV identification. He then personally contacted the DMV and was told that the DMV identification was a forgery. He had Hernandez contact also the Bank of America. The Bank told Hernandez that the address on the DMV identification did not match the address on Apan's account. The bank attempted to contact Apan. When it could not reach her at her listed telephone numbers, the Bank informed the hotel that it had placed a "lock" on the credit card.

Based on his prior experiences, Llamas suspected credit card fraud and notified the Glendale Police Department. Three police officers soon arrived and accompanied Llamas to room 320. Llamas knocked on the door and no one answered.

---

1. The hotel registry denotes that he checked in on November 13, 2001 under the name Nelson Iban. These discrepant facts do not affect the outcome of this appeal.

2. Cunag testified that the photo on the identification was removed from another identification card, and that he did not know the individual pictured.

About 30 seconds later, he knocked again. Cunag and his associates had been inside smoking methamphetamine before they heard the knock, as they had been doing off and on since Cunag booked the room. After the second knock, Cunag opened the door, at which point Llamas said that he would like to discuss the bill. When an officer stepped forward, Cunag stepped back and tried to close the door. The officer persisted, and directed Cunag toward another officer outside the room, where Cunag was detained in the hallway while the other officers entered the room. The other two inhabitants were also removed from the hotel room and all three were handcuffed. In the room, the officers found stolen mail in the bathroom, on the bed, on the kitchen counter, and in a number of travel bags.

## II

## DISCUSSION

### A. Standard of Review

We review the denial of Cunag's motion to suppress de novo, and the underlying factual findings for clear error. *United States v. Jones,* 286 F.3d 1146, 1150 (9th Cir.2002).

### B. Analysis

■■■ The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Whether Cunag had a Fourth Amendment privacy interest in room 320 depends upon whether he had "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *Minnesota v. Olson,* 495 U.S. 91, 95–6, 110 S.Ct. 1684, 109 L.Ed.2d

85 (1990) (internal quotations omitted) (citing *Rakas,* 439 U.S. at 143, 99 S.Ct. 421).

■■■ It is well-settled that a lawfully occupying hotel patron enjoys Fourth Amendment protection in that room. *Stoner v. State of California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." (citations omitted)). That protection continues during the pendency of his tenancy and up until the hotel takes affirmative steps toward repossessing the room. *See United States v. Dorais,* 241 F.3d 1124, 1129 (2001) (holding that "mere expiration of the rental period, in the absence of affirmative acts of repossession by the lessor, does not automatically end a lessee's expectations of privacy"); *United States v. Bautista,* 362 F.3d 584, 586 (9th Cir.2004) (holding that hotel patron maintained Fourth Amendment protection "in the face of an *unconfirmed* report that a stolen credit card number was used to reserve the room" because the hotel had not taken affirmative steps toward repossessing the room) (emphasis added).

Whether an individual enjoys Fourth Amendment protection in a hotel room that he procured through fraud requires a different analysis. In *Rakas,* the Supreme Court elucidated the principle that when an individual is not legitimately on the premises, he does not enjoy the protection afforded by the Fourth Amendment. *Rakas,* 439 U.S. at 141 n. 9, 99 S.Ct. 421 (noting that the exclusionary rule *"would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched "*) (quoting *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)) (emphasis in *Rakas* ).

Thus, the Fourth Amendment rule set forth in *Stoner* and elaborated in *Dorais* applies only if the hotel patron lawfully occupies the room. The *Bautista* court applied *Dorais*, presupposing that Bautista was legitimately on the premises and enjoyed Fourth Amendment protection in his room. *See Bautista*, 362 F.3d at 590 (explaining that Bautista "retained a legitimate expectation of privacy in the room" because "he was still a *lawful occupant*") (emphasis added).

 In *Rakas*, the Supreme Court clarified that merely being "legitimately on premises" does not give rise to a valid Fourth Amendment privacy interest. *Rakas*, 439 U.S. at 148, 99 S.Ct. 421 (limiting the holding of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). The Court noted: "[w]e would not wish to be understood as saying that legitimate presence on the premises is irrelevant to one's expectation of privacy, but it cannot be deemed controlling." *Id.* Here, however, we deal with the obverse of this issue, and a lack of legitimacy is controlling. *Rakas*, 439 U.S. at 141 n. 9, 143, 148, 99 S.Ct. 421; *Jones*, 362 U.S. at 267, 80 S.Ct. 725 (noting that Fourth Amendment protection does not extend to those who are wrongfully present).

To illustrate this principle, the Court used the example of a "burglar plying his trade in a summer cabin during the off season." *Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. 421. The Court noted that while the burglar might not expect to be discovered, he does not enjoy a Fourth Amendment privacy interest in the summer cabin. *Id.* ("A 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered."). Though Cunag argues to the contrary, that example resonates with this case. Like the burglar, Cunag unlawfully gained entry to the premises. Like the burglar, he hoped and believed he might not get caught. But, like the burglar, those hopes and beliefs do not give rise to a legitimate expectation of privacy that society is willing to recognize.

Prior to *Rakas*, the Ninth Circuit mistakenly held that the driver of a stolen car enjoyed the protection of the Fourth Amendment in a search of the car. *Cotton v. United States*, 371 F.2d 385 (9th Cir. 1967). In *Rakas*, the Supreme Court specifically denounced our holding in *Cotton*, noting that "several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile." *Rakas*, 439 U.S. at 141 n. 9, 99 S.Ct. 421 (citing *Cotton*, 371 F.2d 385).

Here, we are confronted with a situation that parallels *Cotton*. Cunag procured this room through deliberate and calculated fraud. Like the driver of the stolen car, Cunag was not a lawful occupant. He admitted that when hotel personnel asked him to provide his authorization from the cardholder, he forged two notes including the signatures of a dead woman, and then manufactured a fraudulent California DMV identification card in response to the request. Even if we were to believe Cunag's story that he was authorized to use then-deceased Paciencia Apan's credit card, it is not the story he presented to the managers in order to procure the room. Rather—as the district court found and as the clear, uncontested evidence demonstrates—he used fraud. During the suppression hearing, through documentary evidence, declarations of the hotel manager, and cross-examination of Cunag himself, the prosecution easily carried its burden to prove that Cunag was unlawfully in the room. *See United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (noting that "the controlling burden of proof at suppression

hearings should impose no greater burden than proof by a preponderance of the evidence").

Cunag countered that he was never told by the hotel that the card was bad, that the hotel accepted the card, that he had authorization from the dead woman's brother to use the credit card, that the card was valid, and that the card had not been revoked for nonpayment since he had been using it. These arguments are unavailing.

The hotel may never have told Cunag that the card was bad, but the hotel did demand proof of Cunag's authorization to use Apan's card and a copy of Apan's identification, both of which Cunag admits he forged. Absent his fraudulent representation of his authorization to use Apan's card, Cunag would not have been able to secure the room. The fact that to some degree the hotel temporarily succumbed to Cunag's fraud, by accepting the card, does not alter the answer to the question of whether he was legitimately on the premises.

Cunag's arguments that the card was still valid and that he was authorized to use it are also belied by the record. The district court found these claims incredible. The court ruled that "[Cunag] knew he had no authorization to use the credit card from anybody, much less the cardholder because she was already dead; and he, through misstatements, lies, fraud, [and] forgery, obtained the use of that room." The court also noted that "even if we accept . . . that [Cunag] had authorization from the brother, the fact of the matter is that he still lied and gave false pretenses to the hotel clerk by claiming to have had authorization from the decedent." We agree. Cunag's bizarre claim that Apan's brother "inherited" Apan's card and authorized Cunag to use it is not supported by any evidence. In fact, Cunag explained at the suppression hearing that he felt the

hotel would not likely rent the room based on that story, so he manufactured authorization directly from the dead woman.

Furthermore, Cunag never put forth any evidence that prior charges he incurred on the card had actually been paid at all. Cunag's omissions and inconsistencies bolster the district court's finding that Cunag's testimony was "farfetched at best" and "totally not deserving of any belief or credibility." The district court's factual finding, that Cunag obtained the room through fraud, is fully supported by the record.

■ *Bautista* correctly held that when a person is *lawfully* present in a hotel room, the "critical determination is whether or not management had justifiably terminated [the patron's] control of the room through private acts of dominion." *Bautista*, 362 F.3d at 590. When, however, the prosecution proves by a preponderance of the evidence at the suppression hearing that the room was procured in the first place by fraud, as is the case here, the analysis employed in *Dorais* and *Bautista* is inapposite, because the hotel patron is not a "lawful occupant." *Id.* Only when a person is lawfully occupying a hotel room does the Fourth Amendment require that he be evicted or that the hotel management take "affirmative steps" toward that end before the premises may be searched without a warrant. *See Rakas*, 439 U.S. at 141 n. 9, 99 S.Ct. 421; *Bautista*, 362 F.3d at 590 (holding that *Dorais* applied in part because "Bautista . . . was a still a lawful occupant"). When the hotel occupant is not legitimately on the premises, we heed the Supreme Court's admonition in *Rakas* and hold that he has no reasonable expectation of privacy protected by the Fourth Amendment. *See Rakas*, 439 U.S. at 141 n. 9, 99 S.Ct. 421.

Cunag procured this (non-smoking) hotel room, his perceived safe haven for

smoking methamphetamine and sorting through pilfered mail, through fraud. He claims that because he was given keys to the room and inhabited it for up to thirty-six hours, he had a legitimate expectation of privacy. The fact that the hotel momentarily succumbed to his fraud is entirely irrelevant. On this record, the trial court's rulings regarding both credibility and legitimate expectation of privacy appear unassailable. Accordingly, we affirm the denial of Cunag's motion to suppress. Cunag had no reasonable expectation of privacy: he never lawfully occupied the hotel room.

**AFFIRMED.**