**UNITED STATES of America, Plaintiff,**

v.

**David M. PERELMAN, Defendant.**

**Case No. 2:09–CR–00443–KJD–LRL.**

United States District Court, D. Nevada.

Aug. 19, 2010.

Roger Yang, U.S. Attorney's Office, Las Vegas, NV, for Plaintiff.

Rene Valladares, Federal Public Defender, Las Vegas, NV, for Defendant.

## ORDER

KENT J. DAWSON, District Judge.

Currently before the Court is Defendant's Motion to Suppress Involuntary Statements (# 18). The Government filed a Response (# 20), to which Defendant filed a Reply (# 23). The Magistrate Judge issued a Report and Recommendation (# 42) on Defendant's Motion, recommending that the Court deny Plaintiff's Motion to Suppress. Defendant filed Objections (# 46) to the Magistrate Judge's Report and Recommendation, to which the Government filed a Response (# 48).

Additionally before the Court is Defendant's Supplemental Motion to Suppress (# 28). The Government filed a Response (# 30), to which Defendant filed a Reply (# 31). The Magistrate Judge issued a Report and Recommendation (# 38), recommending that the Court deny the Supplementary Motion to Dismiss. Defendant filed Objections (# 39) to the Magistrate Judge's Report and Recommendation, to which the Government filed a Response (# 40).

Also before the Court is Defendant's Motion to Dismiss Count Two of the Indictment (# 13). The Government filed a Response (# 19), to which Plaintiff filed a Reply (# 24). The American Civil Liberties Union ("ACLU") also filed a brief in Reply (# 25) as *amicus curaie*, on behalf of Plaintiff. The Magistrate Judge issued a Report and Recommendation (# 41), to which Plaintiff filed Objections (# 50). The Government filed a Response (# 51), to which Plaintiff filed a Reply (# 54). Additionally, before the Court is the Notice of Ninth Circuit Case (# 58), and Supplemental Memorandum (# 60) filed by the Government, and Defendant's Supplement (# 59).

The Court has considered each Motion, Response, Reply, and the *amicus* brief, together with the Magistrate Judge's Reports and Recommendations, Defendant's

Objections, Responses, Reply, and all supplemental information and conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1–4. *De novo* review means the court must consider the matter anew, the same as if it had not been heard before and as if no decision previously had been rendered. *Ness v. Commissioner*, 954 F.2d 1495, 1497 (9th Cir.1992). Thus, although the Court need not hold a *de novo* hearing, the Court's obligation is to arrive at its own independent conclusion about those portions of the Magistrate Judge's Report and Recommendation to which objections have been made. *United States v. Remsing*, 874 F.2d 614, 617 (9th Cir.1989).

Having read and considered the foregoing, and having conducted a *de novo* review, the Court determines that the Magistrate Judge's Report and Recommendations (## 42, 38, 41) are accepted and adopted in whole. Particularly, the Court finds that the facts and issues presented in this case are distinguishable from the facts and issues involved in the recent Ninth Circuit decision in *U.S. v. Xavier Alvarez*, 617 F.3d 1198 (9th Cir. 2010). Specifically, the *Alvarez* decision addresses the constitutionality of sections (b) and (c) of the Stolen Valor Act, 18 U.S.C. § 704, which impose criminal penalty "for the mere utterance or writing" of what is or may be perceived as a representation that an individual has been awarded a military decoration or service medal. (*Id.*, at 1199–1200). The Defendant in this case however, was indicted under sections (a) and (d) of the Statute, for the unauthorized wearing or use of a military or service medal—which was not addressed by the Ninth Circuit in *Alvarez*.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion to

Suppress Involuntary Statements (# 18), Defendant's Supplemental Motion to Suppress (# 28), and Defendant's Motion to Dismiss Count Two of the Indictment (# 13) are **DENIED.**

**IT IS FURTHER ORDERED** that the Magistrate Judge's Report and Recommendations (## 42, 38, 41) are accepted and adopted in whole.

**IT IS FURTHER ORDERED** that Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (# 46, 39, 50) are **DENIED.**

## MOTION TO SUPPRESS INVOLUNTARY STATEMENTS (# 18)

### REPORT & RECOMMENDATION

LAWRENCE R. LEAVITT, United States Magistrate Judge.

The defendant, David M. Perelman, is under indictment on one count of Theft of Government Property in violation of 18 U.S.C. § 641 and one count of Unauthorized Wearing of a Purple Heart in violation of 18 U.S.C. § 704(a) and (d). The matter before the court is Perelman's Motion to Suppress Involuntary Statements (# 18), in which he contends that statements he made to Special Agents of the Department of Veteran Affairs Office of the Inspector General during an interview were involuntary, primarily on grounds that the agents deceptively failed to disclose that they were conducting a criminal investigation into his claims to be a Purple Heart recipient and his status as a disabled veteran and because his use of prescription medications, combined with his PTSD, deprived him of the capacity to competently waive his rights. Also under submission is the government's Opposition (# 20), and defendant's Reply (# 23). An evidentiary hearing was held on this issue on March 1, 2010. Having considered the motion, opposition, reply, and the testimony offered at the evidentiary hearing, the court submits this Report and Recommendation.

### THE EVIDENCE

Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the evidence. At approximately 9:00 a.m. on July 10, 2009, Special Agent Gregory Fitzgerald of the Department of Veteran Affairs Office of the Inspector General ("VAOIG") contacted Perelman at his place of employment, the VA's Northwest Clinic. Perelman had been employed as a clerk with the VA Southern Nevada Healthcare System for approximately three years. SA Fitzgerald identified himself as a special agent with the VAOIG and stated that he was conducting an investigation and wanted to speak with Perelman. Perelman agreed to meet SA Fitzgerald at his office at the East Clinic for an interview at 10 a.m.

Concerned about the interview, Perelman went to speak to his union steward, Gregory Blackburn in Blackburn's office. Blackburn had previously represented Perelman in a union matter. Blackburn testified that Perelman seemed anxious and was seeking representation from Blackburn because he had to go speak with an agent from the VAOIG. Blackburn called the agent, who was later identified as SA Fitzgerald, and asked him why he needed to speak with Perelman. Blackburn specifically inquired whether it was a criminal matter. The agent told Blackburn that it was. Blackburn testified, "I thanked him and I hung up the phone and then I turned to Mr. Perelman and I told him I can't help you because it's a criminal investigation." Blackburn explained that he could not accompany Perelman because it was a criminal matter, and the union does not get involved in criminal matters. Blackburn then advised Perelman, "if he

got there and felt uncomfortable, he should thank them and walk out. I said that's what I would do."

After leaving Blackburn's office, Perelman drove himself to the East Clinic. The drive was approximately thirteen miles. SA Fitzgerald met Perelman in the reception area of the clinic and escorted him through the clinic to a conference room. The conference room had a second door which led to the outside and had windows to the outside. The room was approximately fifteen feet by fifteen feet and contained one large rectangular table with enough seating for ten people. Neither conference room door was locked. Special Agent Michael Morse joined SA Fitzgerald and Perelman in the conference room. Both agents presented their credentials. SA Morse was wearing a suit jacket, slacks, and white dress shirt. SA Fitzgerald was dressed in a suit and tie. Neither agent's sidearm was visible.

After checking Perelman's identification, SA Fitzgerald asked him to take a seat. He then explained to Perelman that he was a special agent with the VAOIG, "just like any other special agent he had heard of from another agency such as the FBI, ATF, DEA, except that my investigations involve criminal matters affecting the VA." He further explained that Perelman was there voluntarily, that he was not under arrest, that he did not have to speak to the agents, and if he did speak with the agents he could stop and leave at any time. Perelman stated that he understood and was willing to speak with the agents.

SA Fitzgerald explained that he and SA Morse investigate various types of crime, including false claims submitted to the VA and that's what they wanted to talk to Perelman about. The agents produced a *Garrity* federal employee advisement of rights form. SA Fitzgerald read the form to Perelman and gave it to Perelman to read. The *Garrity* form states: "You are being contacted to solicit your cooperation in an official investigation regarding misconduct or improper performance of official duties.... The matter under investigation could constitute a violation of law that could result in the criminal prosecution of the responsible individuals." The form provides a blank to fill in what "This inquiry concerns," in which the agents wrote "False Claims." Beneath this section is typed:

> You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time.
>
> Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you.
>
> If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (Fired) solely for remaining silent, however, your silence can be considered in an administrative proceeding for any evidentiary value that is warranted by the facts surrounding your case.

Perelman signed the form under the "Acknowledgment" section, which states:

> I understand the warnings and assurances stated above and I am willing to make a statement and answer questions voluntarily. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SA Fitzgerald explained that the interview would be tape recorded and turned on the recorder.[1] The interview lasted

---

1. The recording of the interview was submitted as Exhibit C to the Motion (# 18) and admitted as the government's Exh. 1 at the hearing.

approximately fifty minutes. Nearly twenty-four minutes into the interview, and after having elicited several inculpatory statements from Perelman, the agents made it explicit that Perelman, himself, was the subject of their criminal investigation and the matter was being sent to the United States Attorney's Office. One agent told him "this is not an administrative matter. This is not a let's just get the VA to re-review it, maybe uh, you know, your disability claim." Perelman began to express concerns about his family, his job, and his life. He did not ask to end the interview. The questioning continued, and Perelman made more inculpatory statements. Around forty minutes into the interview, Perelman stated that he was "all stressed out," and took some kind of pill. The agents offered Perelman water with which to take the pill, which he declined. Perelman's demeanor, speech, and ability to focus did not appear to change after he took the pill. At the end of the interview, the agents turned off the recorder and asked whether Perelman would be willing to make a written statement. Perelman agreed that he would.

Before making the written statement, Perelman asked to use the restroom, which was located outside the conference room. SA Fitzgerald explained where it was, and Perelman walked there and back to the conference room unescorted. He sat down to begin the written statement. SA Fitzgerald explained that he would help with the statement for the purposes of clarity and length and read aloud the advisement of rights at the top of the form.[2] SA Fitzgerald then went over statements that Perelman had made, asking if each was correct. If Perelman

agreed that a statement was correct, SA Fitzgerald told him to write it down. At one point, Perelman wanted to write a statement differently than how SA Fitzgerald had said it, and SA Fitzgerald told Perelman to write it Perelman's way. When the written statement was complete, Perelman was directed to read it over to make sure he agreed with it. SA Fitzgerald had Perelman initial any line-outs or scratch-outs and sign the statement. Perelman then left the clinic and drove away.

## DISCUSSION

 Perelman concedes that because he was not in custody at the time of the interview, the agents were not required to give him an advisement of *Miranda* rights. Reply (# 23) at 2; *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that the Fifth Amendment requires suppression of statements made during a custodial interrogation unless the defendant has been apprised of, and validly waives, his rights to silence and/or the presence of an attorney). The question here is solely one of voluntariness: whether Perelman's confession was the "product of a rational intellect and free will," *see United States v. Pinion*, 800 F.2d 976, 980 (9th Cir.1986) (citations omitted), or whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir.2004) (citing *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.1981)) (quoting *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir.2002)) (other citation omitted); *see also Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct.

---

**2.** With the identifying blanks filled in the form reads, "I, David M. Perelman, residing at 7620 Twisted Pine Ave., having been duly sworn as provided by law, make the following statement freely and voluntarily to SA Greg

Fitzgerald, a Special Agent with the Office of Inspector General, Department of Veteran Affairs, Criminal Investigations Division:" Exh. D to Mot. (# 18).

1336, 10 L.Ed.2d 513 (1963). It is the government's burden to prove by a preponderance of the evidence that a criminal defendant's statement was voluntary. *Bautista,* 362 F.3d at 589 (citing *United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981)). The factual inquiry focuses on (1) the conduct of law enforcement officials in creating pressure, and (2) the defendant's ability to resist that pressure. *Mincey v. Arizona,* 437 U.S. 385, 399–401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Coercion by the authorities is a necessary element of this test. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Citing *Commonwealth of the Northern Mariana Islands v. Mendiola,* 976 F.2d 475, 484 (9th Cir.1993) (overruled on other grounds by *George v. Camacho,* 119 F.3d 1393 (9th Cir.1997)), Perelman asserts that 18 U.S.C. § 3501(b) should serve as a starting point in determining the voluntariness of a confession. Section 3501(b) provides that the following factors be considered in making the determination:

> (1) the time elapsed between arrest and arraignment; (2) the defendant's knowledge of the nature of the offenses for which he was suspected or charged; (3) whether the defendant was advised or knew that he was not required to make a statement and that any statement made could be used against him; (4) whether the defendant was advised of the right to the assistance of counsel; and (5) the presence or absence of counsel when questioned and when making the confession.
>
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Perelman points to factors (3), (4), and (5) of § 3501(b) as particularly relevant to this case. Specifically, Perelman argues that the *Garrity* advisement of rights form deceptively gave him the impression that he was being investigated for workplace, rather than criminal, misconduct, and further failed to advise him of his right to the assistance of counsel. Consequently, the agents were able to first convince Perelman that he was the target of an administrative investigation, then inform him of the true nature of the interview only after eliciting inculpatory statements. Reply (# 23) at 3–4 (analogizing to *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion)) (holding that the district court must suppress statements made after a *Miranda* warning where post-*Miranda* confessions are the result of a deliberate two-step interrogation technique).

■ These factors do little to bolster Perelman's argument. Factor (3), whether defendant was advised or knew that he was not required to make a statement and that any statement made could be used against him, was satisfied in this instance. SA Fitzgerald told Perelman directly that he didn't have to speak with the agents, and that should he decide to speak to the agents he could stop and leave at any time. The *Garrity* form, which SA Fitzgerald read to him and which Perelman himself read and signed, further advised him, "You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time." Factors (4) and (5), which relate to the presence of counsel are inapplicable here. Perelman, himself, concedes that the agents were not required to advise him of his right to the assistance of counsel, because he was not in custody. While counsel may have been helpful to Perelman during the course of the interview, lack of counsel in such a non-custodial interview does not, in itself, render the

circumstances surrounding the confession inherently coercive.

The uncontroverted testimony of the agents indicates that the physical aspects of the interview were not coercive. The conference room was not particularly small, had windows to the outside, and contained two exits, one of which led outdoors. Neither exit door was locked so as to prevent exit. The interview did not take place in either an isolated setting or in an environment overrun with police presence; it was in a room within a VA clinic during the clinic's normal business hours. Perelman was not restrained in any fashion nor did the agents threaten to restrain him. When he asked to use the restroom, the agents told him where it was, and Perelman walked to and from the restroom unescorted. Neither agent made a show of physical force or threatened Perelman with physical force. At no point during the interview or while writing the statement did the agents threaten Perelman with arrest or suggest that he was not free to leave. The agents informed Perelman that he could leave at any time. Perelman drove himself to the clinic, and thus had the means to leave if he so desired. Neither agent displayed a sidearm. The interview was not particularly lengthy, lasting only fifty minutes. All of these facts weigh heavily against a finding of official coercion.

Nor does the evidence support Perelman's contention that the agents deceptively passed themselves off as investigating a purely administrative matter by, among other things, presenting the *Garrity* form, thereby rendering his statements involuntary. SA Fitzgerald specifically told both Perelman and Blackburn that he was investigating a criminal matter. He later told Perelman that he and SA Morse

investigate crimes for the VA, such as false claims submitted to the VA, and that's what they wanted to talk to him about. Thereafter the agents presented the *Garrity* form, on which they indicated that the inquiry concerned "False Claims." SA Fitzgerald both read the form aloud and gave Perelman the opportunity to read it himself. The form alerted Perelman that his statements could be used "in any future criminal proceeding involving you." It further alerted Perelman, "You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time." Perelman signed the form acknowledging that he understood it and was speaking to the agents voluntarily.

None of the evidence supports Perelman's assertion that the agents deceptively acted as though they were investigating an administrative matter. To the contrary, the evidence indicates that Perelman was told repeatedly that VAOIG agents investigate criminal matters. The *Garrity* form did not somehow erase the agents' representations about their role as VAOIG criminal investigators; nor was it improper to present Perelman with a *Garrity* form, insofar as he was being questioned about activities that could affect his employment with the VA. That Perelman may have failed to grasp that *he* was the target of a criminal investigation when he made inculpatory statements to known special agents does not, in itself, render those statements involuntary.

Finally, the evidence does not indicate that Perelman was so affected by the intoxicating effects, if any, of his prescription medications that he lacked the capacity to competently waive his rights.[3] Rather, the

**3.** While Perelman asserts in his Motion (# 18) and Reply (# 23) that the drugs, mixed with PTSD, diminished his capacity to waive his rights, the record contains no evidence that Perelman suffered from PTSD.

agents' testimony and the recording of the interview indicate that Perelman "was coherent, gave responsive answers to questions, and was able to remember accurately [details]." *United States v. George,* 987 F.2d 1428, 1431 (9th Cir.1993) (citations omitted) (holding statements voluntary even though defendant was in the hospital suffering from "an apparent drug overdose" inasmuch as his injuries "did not render him unconscious or comatose"). Perelman's speech was clear, he seemed to understand the questions he was being asked, and even challenged the agents' version of events. He appeared to be oriented and responsive and had a notepad and pen with him to take notes during the interview. Perelman also drove himself to the interview site and away from it. SA Morse testified that had Perelman appeared intoxicated or otherwise incapacitated, he would have directed him to the clinic for his own safety and for reasons of liability.

SA Fitzgerald noted that while Perelman walked with a limp, he didn't stumble, lose his balance, or show any other signs of difficulty walking when he arrived at the clinic, went to the restroom, or left the building. Though he took a pill during the interview, it did not appear to affect Perelman's ability to participate in the interview. Rather, even as he was writing his statement, Perelman was actively engaged in how to characterize his actions. None of the evidence indicates that Perelman was incapacitated by his medication, nor that his will was overborne by physical or psychological coercion, so as to render his confession involuntary. The evidence indicates quite the contrary.

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Perelman's Motion to Suppress Involuntary Statements (# 18) should be denied.

DATED this 1st day of June, 2010.

### REPORT & RECOMMENDATION

#### SUPPLEMENTAL MOTION TO SUPPRESS PRIVILEGED STATEMENTS (# 28).

The defendant, David M. Perelman, is under indictment on one count of Theft of Government Property in violation of 18 U.S.C. § 641 and one count of Unauthorized Wearing of a Purple Heart in violation of 18 U.S.C. § 704(a) and (d). The matter before the court is Perelman's Supplemental Motion to Suppress Privileged Statements (# 28), in which he contends that statements made between him and his union steward, as well as a letter allegedly provided to the union steward, should be suppressed as privileged. Also under submission is the government's Opposition (# 30), and defendant's Reply (# 31). Arguments were heard on this issue at an evidentiary hearing held on defendant's Motion to Suppress Involuntary Statements (# 18) in this case on March 1, 2010. Having considered the motion, opposition, reply, and arguments, the court submits this Report and Recommendation.

### THE EVIDENCE

Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the evidence. At approximately 9:00 a.m. on July 10, 2009, Special Agent Gregory Fitzgerald of the Department of Veteran Affairs Office of the Inspector General (VAOIG), phoned Perelman at his place of employment, the VA's Northwest Clinic. Perelman had been employed as a clerk with the VA Southern Nevada Healthcare System for

approximately three years. SA Fitzgerald identified himself as a special agent with the VAOIG and told Perelman he was conducting an investigation and wished to speak with him. Perelman agreed to meet with SA Fitzgerald at 10 a.m. for an interview at Fitzgerald's office in the East Clinic.

Concerned about the interview, Perelman spoke to his union steward, Gregory Blackburn, in Blackburn's office. Blackburn had previously represented Perelman in a union matter. At the hearing Blackburn testified that Perelman, who seemed anxious, asked him to be his representative during an upcoming interview with an agent of the VAOIG. Blackburn called the agent, who was later identified as SA Fitzgerald, and asked him what he wanted to speak to Perelman about. Blackburn specifically inquired whether it was in connection with a criminal matter. The agent told Blackburn that it was. Blackburn testified that he "thanked him and I hung up the phone and then I turned to Mr. Perelman and I told him I can't help you because it's a criminal investigation." Blackburn explained further on cross examination, "I dismissed the union portion of our conversation at the time the gentleman told me it was a criminal investigation. I said our union vice president will not allow us to get involved in criminal investigations, so at that time I pretty much terminated the conversation as union steward, but I did give him advice." Specifically, Blackburn told Perelman, "if he got there and felt uncomfortable, he should thank them and walk out. I said that's what I would do." Though Blackburn's office door was open, the conversation was described as "private." Perelman left Blackburn's office and drove himself to the interview with the VAOIG. Two or three days later, Blackburn and Perelman spoke again, and Blackburn advised Perelman that he should hire a lawyer. Also at that time Perelman allegedly gave Blackburn a copy of a letter regarding his Purple Heart.

## DISCUSSION

Federal Rule of Evidence 501 provides that "privileges shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Rule 501 is not intended to "freeze the law of privileges." *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). Rather, the rule acknowledges the authority of the federal courts to continue "to develop rules of privilege on a case-by-case basis." *Trammel,* 445 U.S. at 47, 100 S.Ct. 906 (citation and quotations omitted). In *Jaffee v. Redmond,* 518 U.S. 1, 10–15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), the Supreme Court provided guidance for lower courts in determining whether to establish a new privilege under Rule 501, instructing that courts consider whether the privilege is "rooted in the imperative need for confidence and trust," 518 U.S. at 10, 116 S.Ct. 1923 (internal quotation marks omitted), whether the privilege would "serve public ends," *id.* at 11, 116 S.Ct. 1923 (internal quotation marks and alteration omitted), what evidentiary benefit would arise from denying the privilege, *id.* at 11–12, 116 S.Ct. 1923, and the States' rules on the subject, *id.* at 12–15, 116 S.Ct. 1923.

While declining to recognize a union member-union official privilege, the court in *In re Grand Jury Subpoenas Dated January 20* explained that four criteria are generally relevant in recognizing a new privilege: (1) the communication at issue must be made in confidence, (2) confidentiality must be essential to the maintenance of a full and satisfactory relationship between the parties, (3) the parties' relationship must be one that the community has decided ought to be sedulously fos-

tered, and (4) the injury that would inure to the relationship by the disclosure of the communication must plainly outweigh the important societal interest in obtaining all the evidence necessary to ensure the correct disposal of litigation. *In re Grand Jury Subpoenas Dated January 20, 1998,* 995 F.Supp. 332, 334 (E.D.N.Y.1998) (citing 8 J. Wigmore, Evidence § 2285 (McNaughton Rev.1961).) "It is the party seeking an exception from this principle that bears the burden of establishing the existence of a privilege and its applicability to a particular case." *In re Grand Jury Subpoenas,* 995 F.Supp. at 334.

■ Defendant fails to meet his burden of establishing applicability of such a privilege in this particular case. First, he fails to adequately justify why a union privilege should be created and applied in the context of this criminal matter, in which no union related issue is implicated. Neither Perelman's employment with the VA nor his membership in a union has anything to do with this case. Blackburn's clear dismissal of his role as Perelman's union steward upon learning that SA Fitzgerald was investigating a criminal matter only underscores this point; no vital interest of the union was implicated by the criminal investigation being conducted by the VAOIG.

Second, the conversation for which the defendant seeks the protection of a privilege did not occur between a union member and a union official discussing union related business. Blackburn's express dismissal of the "union portion" of the conversation took both men's statements outside of the union context. The advice Blackburn gave to Perelman was only personal, followed by the statement, "that's what I would do." Thus, while Perelman and Blackburn may have spoken privately, the men were not speaking within the ambit of a union relationship. They were speaking merely as coworkers. In that context

there is not the "imperative need for confidence and trust" that would warrant the creation of an evidentiary privilege. *Jaffee v. Redmond,* 518 U.S. at 11, 116 S.Ct. 1923.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Perelman's Supplementary Motion to Suppress Privileged Statements (# 28) should be denied.

DATED this 29th day of March, 2010.

## REPORT & RECOMMENDATION

### MOTION TO DISMISS COUNT TWO OF THE INDICTMENT (# 13)

The defendant, David M. Perelman, is under indictment on one count of Theft of Government Property in violation of 18 U.S.C. § 641 and one count of Unauthorized Wearing of a Purple Heart in violation of 18 U.S.C. § 704(a) and (d). The matter before the court is Perelman's Motion to Dismiss Count Two of the Indictment (# 13), in which he makes a facial constitutional challenge to the statute under which he is charged, 18 U.S.C. § 704(a). The court has considered the motion, the government's Opposition (# 19) and defendant's Reply (# 24). Additionally, the ACLU of Nevada filed an Amicus Brief (# 14) and Reply (# 26) in support of the motion to dismiss. Oral arguments were heard on March 1, 2010. Having considered the written submissions and the oral arguments of counsel, the court submits this Report and Recommendation.

## BACKGROUND

Title 18 of the United States Code, Section 704(a) provides:

Whoever knowingly wears, purchases, attempts to purchase, solicits for purchase, mails, ships, imports, exports,

produces blank certificates of receipt for, manufactures, sells, attempts to sell, advertises for sale, trades, barters, or exchanges for anything of value any decoration or medal authorized by Congress for the armed forces of the United States, or any of the service medals or badges awarded to the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal, or any colorable imitation thereof, except when authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months, or both.

The defendant brings a facial challenge to § 704(a), alleging that the clause "except when authorized under regulations made pursuant to law" violates the First Amendment as an unlawful prior restraint on free speech, because it allows the government unfettered discretion to authorize, or to refuse to authorize, someone to wear a military medal depending upon the individual's purpose for wearing the medal.[1] Such unfettered discretion, it is argued, opens the door to government imposed, viewpoint-based restrictions on speech. For example, under this statute, according to the defendant, the government could permit an actor in a patriotic theatrical production to wear a medal, but deny a war protester's request to wear such a medal.

The government contends that one is "authorized" to wear a medal if one has "earned" the medal, so to speak. In the government's view, "authorization" to wear a medal within the meaning of § 704(a) does not mean that an individual to whom a medal has not been issued must somehow seek governmental permission to wear

one. For example, the mother of a fallen soldier would not be required to obtain governmental permission to wear her son's medal at his memorial service. Although the statute prohibits sixteen discrete acts, the parties focus only the First Amendment implications of the "unauthorized" act of *wearing* a service medal.

## DISCUSSION

Courts generally disfavor facial challenges to legislation, in part because a finding of unconstitutionality undermines and frustrates the intent of the elected representatives of the people. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 128 S.Ct. 1184, 1191, 170 L.Ed.2d 151 (2008); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) ("Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort.") (internal quotations and citation omitted). Although this reluctance is somewhat relaxed in the First Amendment context, a defendant still "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *See Finley*, 524 U.S. at 580, 118 S.Ct. 2168; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (requiring showing that a challenged enactment "pose[s] a real and substantial threat of the identified censorship risks").

 A scheme that requires permission from the government, or its designee, before one may engage in constitutionally-protected expression, constitutes a prior

---

1. Section 704(a) refers to "any of the service medals or badges awarded to the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal." For ease of discussion, and inasmuch as the parties refer to this list of items collectively as "medals," the court also will use the word "medals" to refer collectively to the list of regulated items.

restraint. *See Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 150–151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). To determine whether the statute impermissibly grants "the licensing official ... unduly broad discretion," the Ninth Circuit considers whether the language of the statute "contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review," and mitigates the "risk that [the licensor] will favor or disfavor speech based on its content." *Seattle Affiliate of the October 22nd Coalition To Stop Police Brutality, Repression and the Criminalization of a Generation v. City of Seattle,* 550 F.3d 788, 798 (9th Cir.2008) (internal quotations and citations omitted). "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially," even when that person has neither applied for nor been denied a license. *City of Lakewood,* 486 U.S. at 755–56, 108 S.Ct. 2138.

Content-based regulation of fully-protected speech bears "a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Thus, while a presumption of constitutional validity exists in most contexts, the reverse is true for a First Amendment challenge to a content-based restriction on fully-protected speech. *See Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *R.A.V. v. St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("Content-based regulations are presumptively invalid."). It is

generally the government's burden to demonstrate that a restriction on expression is narrowly tailored to bring about a compelling government interest. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *United States v. O'Brien,* however, the Court in upholding a statute which prohibited the destruction of draft cards, explained that where nonspeech activity has incidental First Amendment effects, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Prosecutions for violations of § 704(a) in federal courts are rare; this is the first such prosecution in the District of Nevada. As a result, scant case law has developed to illuminate the meaning of § 704(a), and more specifically, what it means to say that it is a crime to wear a military medal "except when authorized under regulations made pursuant to law." No court has addressed whether that phrase constitutes an unlawful prior restraint on speech. Notably, however, the Supreme Court has upheld 18 U.S.C. § 702, which, in language strikingly similar to § 704(a), provides: "Whoever ... without authority, wears the uniform or a distinctive part thereof or anything similar to a distinctive part of the uniform of any of the armed forces of the United States, Public Health Service or any auxiliary of such, shall be fined ... or imprisoned not more than six months, or both," finding that the statute "standing

alone, [is] a valid statute on its face." *Schacht v. United States*, 398 U.S. 58, 61, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (citing *O'Brien*, 391 U.S. 367, 88 S.Ct. 1673) (but holding a companion provision, 10 U.S.C. § 772(f), which authorized actors to wear military uniforms in theatrical productions except in portrayals which tended to discredit Armed Forces to be an unconstitutional restraint on an actor's right of free speech, and accordingly striking a portion section 772(f) while leaving 18 U.S.C. § 702 intact).

While § 702 is similar in construction to § 704(a), the Court in *Schacht* did not explain why § 702 was "a valid statute on its face." Nor was the meaning of the word "authorized" at issue in that opinion. Accordingly, while *Schacht* suggests that § 704(a) may be constitutional on its face pursuant to the *O'Brien* factors, the decision provides little guidance as a prior restraint challenge to the phrase "except when authorized under regulations made pursuant to law." Thus, the court must determine what that phrase means, and whether it constitutes an impermissible prior restraint on protected speech in violation of the First Amendment.

### A. The Meaning of "Authorized" in § 704(a)

The "unauthorized wearing, manufacture, or sale of medals and badges" has been punishable by fine or imprisonment since 1923. *See* Act of February 24, 1923, ch. 110. 42 Stat. 1286 (former 10 U.S.C. § 1425). The 1923 Act provided, in pertinent part:

[T]he wearing, manufacture, or sale of [specific medals and badges] awarded by the War Department, or the ribbon, button, or rosette thereof of the form as is or may hereafter be prescribed by the Secretary of War, or any colorable imitation thereof, *is prohibited, except where authorized under such regula-*

*tions as the Secretary of War may prescribe.*

*Id.* (emphasis added).

In 1928, the Seventieth Congress made some minor changes to the wording of the 1923 Act, which closely resemble the current wording of what we now know as § 704(a):

That hereafter the wearing, manufacturing, or sale of the congressional medal of honor, distinguished-service cross, distinguished-service medal, distinguished-flying cross, soldier's medal, or any other decoration or medal, which has been, or may be, authorized by Congress for the military forces of the United States, or any of the service medals or badges which have been, or may hereafter be, awarded by the War Department, or the ribbon, button, or rosette of any of the said medals, badges, or decorations, of the form as is or may hereafter be prescribed by the Secretary of War, or of any colorable imitation thereof, *is prohibited, except when authorized under such regulations as the Secretary of War may prescribe.*

Act of April 21, 1928, ch. 392, 45 Stat. 437 (former 10 U.S.C. § 1425) (emphasis added).

In 1948, 18 U.S.C. § 704 was enacted. It was based on former 10 U.S.C. § 1425, and read as follows:

Whoever knowingly wears, manufactures, or sells any decoration or medal authorized by Congress for the Armed Forces of the United States, or any of the service medals or badges awarded by the War or Navy Departments, or the ribbon, button, or rosette of any such badge, decoration or medal, or any colorable imitation thereof, *except when authorized under regulations made pursuant to law,* shall be fined not more than $250 or imprisoned not more than six months, or both.

*Id.* (emphasis added). As is apparent, § 704 was made applicable to the decorations and medals of the Navy Department as well as those of the War Department, as it was then known. Although minor modifications to § 704 were made in 1949, 1994, 1996, and 2001, it was not until the enactment of the 2005 Stolen Valor Act ("the Act") that the statute underwent a major revision. The Act expanded the scope of § 704. The Act's proponent, Congressman Salazar, explained that § 704 had "allow[ed] Federal law enforcement to prosecute individuals who physically wear medals on their persons. The problem has been occurring where individuals are claiming to have earned these medals and there is no way for authorities to be able to prosecute these individuals." 152 Cong. Rec. H8819 (daily ed. Dec. 6, 2006) (statement of Rep. Salazar). Hence, the Act was intended to "make[ ] a language fix to the current Federal statute, to include making verbal and written claims to be the recipient of a military medal that they were not entitled to." *Id.* In other words, the Act simply broadened the scope of the entire section to penalize other acts in addition to the wearing, manufacturing or selling of medals. In addition to prohibiting these three acts, § 704(a) was supplemented to prohibit a more comprehensive list of activities, including purchasing, mailing, importing, and advertising medals for sale, among others. The wording regarding the wearing of medals, however, has remained virtually unaltered since 1928.[2]

The implementing regulations for § 704 are found in 32 C.F.R. § 507. "Possession and wearing" of service medals is addressed in 32 C.F.R. § 507.12, which generally mirrors the language of § 704. Section 507.12(a) provides that the wearing of a service medal, among other items, "prescribed or authorized by the Department of the Army and the Department of the Air Force by any person not properly authorized to wear such device, or the use of any decoration, service medal, badge, service ribbon, lapel button, or insignia to misrepresent the identification or status of the person by whom such is worn is prohibited." Section 507.12(b) provides that, "mere possession" is "authorized provided that such possession is not used to defraud or misrepresent the identification or status of the individual concerned." Section 507.12(c) corresponds to that portion of § 704 related to the "use" of medals.

One other federal court has addressed the constitutionality of § 704(a). In *United States v. McGuinn,* 2007 WL 3050502, *3 (S.D.N.Y. Oct. 18, 2007) (unpublished), the defendant challenged § 704(a) as overbroad and/or vague. There, the court "assumed, without deciding, that, as a general proposition, wearing military medals or decorations is constitutionally protected speech," and analyzed the constitutional challenges accordingly. *McGuinn,* 2007 WL 3050502 at *2. The court construed the word "authorized" to mean that the statute requires a person who wishes to wear the military medal of another to seek authorization to do so. As the court in *McGuinn* explained:

> [I]f a parent wishes to wear his or her child's military medals or decorations to honor that child at a funeral or parade, the parent must seek and obtain authorization to do so, under regulations made pursuant to law. Similarly, if a person wishes to wear military medals or decorations in a theatrical, cinematic or television production, a person must seek

---

**2.** The 2006 amendment also added § 704(d), which provided an enhanced penalty for unlawfully wearing certain medals, including the Purple Heart, in violation of § 704(a). It is now a Class A misdemeanor punishable by up to one year in prison.

and obtain authorization to do so, as provided by the statute. *Id.* at \*3. This is essentially the position taken by Perelman in this case.

■■■ This court respectfully disagrees. Notably, the *McGuinn* decision does not identify a regulation that governs the procedure, if any, by which a parent, loved one, or theatrical performer, or anyone else, would be required to seek authorization to wear the medal of another. Nor is this court able to locate such a regulation. However, this court has located an extensive body of Army regulations, entitled Personnel–General Military Awards, which prescribe the parameters and procedures surrounding the authorization of medals for service personnel. Army Regulation 600–8–22.[3] For example, AR 600–8–22 § 3–8 prescribes the "authority and criteria" for the Distinguished Service Cross and is representative of other prescribing sections:

a. The Distinguished Service Cross, section 3742, title 10, United States Code (10 USC 3742), was established by Act of Congress 9 July 1918 (amended by act of 25 July 1963).

b. The Distinguished Service Cross is awarded to a person who, while serving in any capacity with the Army, distinguished himself or herself by extraordinary heroism not justifying the award of a Medal of Honor; while engaged in an action against an enemy of the United States; while engaged in military operations involving conflict with an opposing or foreign force; or while serving with friendly foreign forces engaged in an armed conflict against an opposing Armed Force in which the United States is not a belligerent party. The act or acts of heroism must have been so notable and have involved risk of life so extraordinary as to set the individual apart from their comrades.

In light of such prescribing regulations, it is this court's view that the phrase "except when authorized under regulations made pursuant to law" refers directly to these regulations and others like them which have been or will be promulgated by the Air Force or other military awarding bodies. Accordingly, one is "authorized" to wear a medal within the meaning of § 704(a) if one has fulfilled the criteria set forth in the prescribing regulation, that is, by being recommended for and granted authority to wear it pursuant to the prescribing regulations referenced above. In other words, one is "authorized" to wear a medal within the meaning of § 704(a) if one has *earned* it.

Such a meaning is historically consistent with General George Washington's admonition when speaking of the Military Merit Badge (predecessor of the Purple Heart) in 1782: "Should any who are not entitled to these honors have the insolence to assume the badges of them, they shall be severely punished." 152 Cong. Rec. H8819, *supra* (quoted by Rep. Salazar). This meaning is also implied by the military in an opinion of the United States Court of Appeals for the Armed Forces in *United States v. Avila,* which this court finds instructive regarding the meaning of "unauthorized wearing." 47 M.J. 490, 492

---

**3.** It is worth noting that at the time the Stolen Valor Act was passed these regulations prescribing policy and criteria for military awards and the administrative instructions for processing military awards were codified at 32 C.F.R. § 578. 1 *et seq.* The Department of Army petitioned to have the regulations removed from the Code of Federal Regulations in 2008, because it "determined that the rules prescribing policy and criteria for military awards and the administrative instructions for processing military awards are not required to be published in the Code of Federal Regulations (CFR) because they are not generally applicable and have no legal effect per 44 U.S.C. 1505." Decorations, Medals, Ribbons, and Similar Devices, 73 Fed.Reg. 66754 (November 12, 2008).

(1998) (holding that the defendant, charged with unauthorized wearing of a Bronze Star, was not prejudiced by testimony which was admitted in error, insofar as the remaining evidence on the issue of whether the accused had been awarded the medal demonstrated that "no [ ] records were found listing appellant as a Bronze Star recipient; the only record of appellant having received a Bronze Star was the certificate found among his personal effects and a duplicate copy found in his personnel file").

## B. Section 704(a) Does Not Restrict Speech in Violation of the First Amendment

■ Inasmuch as § 704(a) does not vest discretion in a government official to allow or disallow the wearing of medals by those who were not awarded them for their military service, *see City of Lakewood,* 486 U.S. at 755–56, 108 S.Ct. 2138, this court finds that § 704(a) is not a licensing scheme which impermissibly gives the government unfettered discretion to engage in viewpoint-based restriction of speech. Section 704(a) simply does not require anyone to seek permission from the government to engage in constitutionally-protected expression. *See Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Rather, except for those who were duly awarded the medals, § 704(a) provides an across-the-board prohibition against the wearing of military medals, irrespective of the reason why a person who did not earn a particular medal might want to wear it. Hence, there is no risk that application of § 704(a) "pose[s] a real and substantial threat" of viewpoint based censorship of speech. *See City of Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138.

Defendant nevertheless argues that "[w]hile the text of the statute at issue here does not explicitly prohibit expressive conduct that would negatively affect the reputation of the armed forces, Congress's findings in adopting the 2005 amendments to § 704 clearly shows this is precisely the sort of speech the government seeks to restrain," a purpose which is unconstitutional under *Schacht.* Mot. (# 13) at 7. Whether this is so or not, the 2005 amendments did not add that portion of the statute which is challenged here. The language defendant challenges preceded the 2005 amendments and has remained virtually unaltered since 1928. As explained above, the challenged portion of the statute, *viz.,* "except when authorized under regulations made pursuant to law," refers to the authorization gained by the recommendation for and ultimate grant of authority to wear a medal pursuant to regulations such as those produced by the Army, and not permission for the public to wear a medal in a play as defendant argues.

Importantly, the regulations setting forth the criteria for authorization to wear particular medals neither directly regulate speech nor are they intended to regulate speech. Rather the express purpose of the medals program is "to foster mission accomplishment by recognizing excellence of both military and civilian members of the force and motivating them to high levels of performance and service." AR 600–8–22 § 1–1. The decision to authorize one to wear a specific medal is not based on any expressive intent or desire of the would be wearer. Indeed, pursuant to the regulations, one cannot even recommend oneself for a medal. AR 600–8–22 § 3–4 ("The Army does not condone self-recognition; therefore, a Soldier may not recommend himself/herself for award of a decoration."). Rather, both the decision to recommend and the final grant of authority to wear are based on third party observation of the acts of the individual in performing his or her duty, combined with such objective elements as whether he or she was "engaged in an armed conflict against an opposing Armed Force in which

the United States is not a belligerent party," and/or whether said conflict was opposing a foreign force, against an "enemy of the United States." *See* AR 600–22–8 § 3–8(b) (prescribing authority and criteria for Distinguished Service Cross).[4] Section 1–16 of AR 600–8–22 provides the mechanism for appeal of a disapproved or downgraded award recommendation. "Revocation of personal decorations and suspension of authority to wear," is prescribed by AR 600–8–22 § 1–31.

■■■ Thus, insofar as § 704(a) does not, itself, regulate speech but could have an incidental effect on speech, the court agrees with the government that *United States v. O'Brien* provides the appropriate measure for review. Application of *O'Brien* is also consistent with the decision in *Schacht. See Schacht*, 398 U.S. at 61, 90 S.Ct. 1555 (citing *O'Brien*, 391 U.S. 367, 88 S.Ct. 1673 to find 18 U.S.C. § 702, which is similar in construction to § 704(a), "standing alone, [is] a valid statute on its face."). Under *O'Brien*, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. 1673.

As stated in the findings of the Act, the purpose of § 704 is to "protect the reputation and meaning of military medals and decorations," Stolen Valor Act of 2005, Pub.L. No. 109–437, § 1998, 120 Stat. 3226 (2006) at § 2, and it applies to those med-

als "authorized by Congress for the armed forces of the United States." 18 U.S.C. § 704(a). As explained above, the purpose of the medals program, itself, is "to foster mission accomplishment by recognizing excellence of both military and civilian members of the force and motivating them to high levels of performance and service." AR 600–8–22 § 1–1. Such a purpose is within the constitutional power of the government, insofar as "the Constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. The government's interest in motivating military personnel to high levels of performance is clearly important and substantial. Such an interest is also, as the government notes, "wholly unrelated to the suppression of speech." Opp'n (# 19) at 7.

Finally, as to whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," the government's argument that "it would simply be impossible to prevent or avoid the proliferation of false medals, certificates, and claims concerning service without section 704(a)" is well taken. To allow the unrestricted wearing of medals by those not authorized to do so would be to undermine the purpose of the medals program and the statute designed to protect that purpose. Anything less than an across the board prohibition as presented by § 704(a), however, would introduce the very specter that defendant argues so ardently against: a system allowing some, but not all, to wear the medals at the discretion of the government.[5] According-

---

4. Interestingly, the Purple Heart—the alleged unauthorized wearing of which is the underlying factual basis for defendant's indictment under § 704(a)—"differs from all other decorations in that an individual is not 'recommended' for the decoration; rather he or she

is entitled to it upon meeting specific criteria." AR 600–8–22 § 1–14(c) (criteria for timeliness of award); *Id.* at § 2–8(c) (criteria for Purple Heart).

5. The court notes that the statute does not prevent the wearing of an imitation medal, so

ly, the court finds that 18 U.S.C. § 704(a) is constitutional on its face. *Accord Schacht*, 398 U.S. at 61, 90 S.Ct. 1555.

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Perelman's Motion to Dismiss Count Two of the Indictment (# 13) should be denied.

DATED this 1st day of June, 2010.

long as it is not a "colorable imitation." While the court is not asked to address the issue of what would be an impermissible "colorable imitation," the court in its research has observed that the medals and badges at issue here are produced to strict standards and guidelines, including among others: specification of color, i.e., "Ultramarine Blue 67118," "Old Glory Red 67156," or "White 67101"; precise width of a color stripe, i.e., "3/64" or "7/32" inch; and often, a specific design or text set in a specific pattern and script on the back of a medal, i.e., "For Gallantry in Action" on the Silver Star or "FOR MILITARY MERIT" below the coat of arms and leaves on Purple Heart. *See* The Institute of Heraldry, Decorations and Awards, http://www.tioh.hqda.pentagon.mil/Awards/decorations.aspx (providing pictures, criteria, specifications, and history of individual medals and decorations). Accordingly, it appears entirely possible to wear an imitation medal, which expresses the message of a decorated veteran, without violating the statute's prohibition of wearing an actual medal or colorable imitation thereof.