Filed 8/24/15  P. v. Hernandez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BERNARD HERNANDEZ,<br><br>        Defendant and Appellant. | B256010<br><br>(Los Angeles County<br>Super. Ct. No. KA102935) |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

Kimberly Howland Meyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Bernard Hernandez appeals the judgment following his conviction and sentence for multiple identity theft and related counts. He argues (1) his constitutional rights were violated by an illegal search of the hotel room he occupied; (2) insufficient evidence supported his conviction for second degree burglary; and (3) the trial court violated his constitutional rights to confrontation and cross-examination by excluding audio recordings of police officers during their entry into the hotel room he occupied. We reject each of these contentions and affirm.

## PROCEDURAL HISTORY

Hernandez was charged with three counts of misdemeanor identity theft (Pen. Code, § 530.5, subd. (c)(1); counts 1, 2, & 3);[1] one count of felony identifying information theft (§ 530.5, subd. (c)(3); count 4); one count of second degree commercial burglary (§ 459; count 5); two counts of identity theft (§ 530.5, subd. (a); counts 6 & 7); three counts of receiving stolen property (§ 496, subd. (a); counts 8, 9, & 10); one count of possession of a forged driver's license (§ 470b; count 15); one count of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 16); and one count of misdemeanor possession of an opium pipe (Health & Saf. Code, former § 11364.1, subd. (a)(1); count 17). It was alleged appellant had suffered three prior serious or violent felonies (§§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)) and four prior prison terms (§ 667.5, subd. (b)). During trial the court granted a prosecution motion to dismiss counts 4, 7, and 9, and a jury found Hernandez not guilty of count 6, but found him guilty of the remaining nine counts. Appellant admitted the prior serious and violent felony and prior prison term allegations, and the court sentenced him to eight years in prison. Appellant timely appealed.

## STATEMENT OF FACTS

On August 21, 2013, Roxanne Golchini checked into a room at Casa 425, a hotel in Claremont, for a one-night stay. The next morning, hotel assistant manager Audrey Mangan reviewed the guest list and recognized Golchini's name as someone who had stayed at the hotel for a few days a month earlier, causing damage to the room, smoking in the room,

---

[1] Undesignated statutory citations are to the Penal Code unless otherwise noted.

causing the bathtub to overflow, and breaking items. A month later, Mangan had learned that the credit card Golchini used was fraudulent. Around the same time, the hotel had been contacted by a local merchant reporting that Golchini had used a fraudulent credit card with that merchant while she was a guest at Casa 425. As a result, the general manager of the hotel had filed a formal complaint with the Claremont Police Department. When Mangan saw Golchini's name on the guest registry on August 22, 2013, she contacted the general manager and called the police to request assistance evicting Golchini from the room.

Four Claremont police officers arrived at the hotel around 8:00 a.m. on August 22, 2013, in response to Mangan's call. After obtaining information from Mangan, Officers Jeff Ting, Hector Tamayo, and Michael Snyder, along with Detective Isaac Reyes, proceeded to room 312 on the third floor to contact Golchini. The officers knocked forcefully and loudly announced their presence. They received no response, so Officer Ting tried unsuccessfully to open the door with the key card provided by Mangan. They continued to knock for one or two minutes. At some point, the curtains in front of the door were pulled back quickly, and the officers spotted a hand and face, but no one opened the door.

While officers remained at the door, Detective Reyes went to look for the Ford Fiesta Golchini had registered with the hotel when she checked in. As he left the parking structure, he saw the window to room 312 being opened. It appeared appellant tied a sheet to a portion of the window and threw it down the side of the building. As appellant leaned out the window, Detective Reyes radioed the officers outside the room and advised them to force entry because it appeared someone was about to jump out the window. As Detective Reyes yelled at appellant to stop, appellant looked at him and backed into the room.

Officer Snyder smashed the glass next to the hotel room door handle, reached in, and unlocked the door. The officers entered and found appellant alone in the room. Appellant did not give officers his name or tell them whose room it was. After appellant was detained, Officer Snyder did a protective sweep of the room looking for other individuals. He observed the bed sheet removed from the bed and tied to the window crank. The comforter was partially on the floor and "bubbled up," so Officer Snyder used his foot to move it to make sure no one was hiding under it. When he did, several credit cards, identification

3

cards, and a checkbook fell to the floor. He also saw various articles of men's clothing in the room, including a man's blazer. Neither the initial sweep nor the later search pursuant to a warrant turned up any female clothing or toiletries except a woman's hair clip.

Officer Ting noticed a methamphetamine pipe on the coffee table. On the desk he saw an open black pouch containing a small baggie of methamphetamine. He also saw credit cards on the coffee table and bed. And he found an open canvas bag on the floor containing some type of embossing machine. Later, when officers searched the room pursuant to a warrant, Detective Reyes gave Officer Ting two identification cards, which had color that was "off," were flimsy, and lacked a California holographic seal. A records check turned up different names than on the cards. Detective Reyes also gave Officer Ting a Nissan key fob, which Officer Ting used to locate a Nissan Altima parked on the street outside the hotel.

At the police station, appellant gave the name of Paul Anthony Amaro and the date of birth of February 1, 1980. Fingerprinting revealed his real identity, however.

After appellant's arrest, Detective Reyes obtained and executed a search warrant for the hotel room, turning up male clothing and toiletries. A brown wallet was found containing three identification cards bearing appellant's photograph, two of which had the same driver's license number, and one of which had the name Paul Anthony Amaro. Nothing in the wallet bore appellant's real name. Five or six cell phones were found, three of which could be turned on. A search of those yielded photographs of appellant and others, photographs of Visa cards in various names, and photographs of handwritten notes. Text messages were also recovered dated August 20, 2013, between "JonJon" and "Me" containing references to credit cards; at one point, "Me" wrote, "Remember my name is Paul Amaro." A checkbook, checks, and additional credit cards were found on the bed and on the comforter on the floor. A black zippered pouch was also found containing approximately 29 credit, debit, and gift cards, some of which were blank and some of which had account numbers. A blank Visa card was found in the embossing machine. A small portable scanner, a container of red invisible ink used to make watermarks, an aluminum case containing small tools used to fabricate cards, and additional blank checks were all

4

seized. In all, officers found 55 blank and embossed credit cards; identification cards with seven or eight different names; and checks with four to five different names.

A search of the Nissan Altima yielded piles of male clothing in the back seat. It was a Hertz rental car, and a rental agreement was found in a backpack in appellant's room indicating the car had been rented to "Tuan Luong."

In his defense, appellant testified that, on August 22, 2013, a friend dropped him off at Casa 425 around 3:00 a.m., where he met Golchini in the parking lot. He had not had a place to stay for a few days, and Golchini allowed him to shower and sleep in the room for the night. He only had his cell phone, a bag of toiletries, and two grocery bags of clothing with him. When he entered the room, he noticed there were no covers on the bed and someone else's clothes were hanging on the rack. While appellant was taking a shower, Golchini left and returned with food. After eating, appellant went to sleep.

He was awakened by police officers knocking on the door. He immediately panicked because he was on probation and had not reported to his probation officer. He tied a bed sheet to the window crank and looked out the window, but it was too far to jump, so he stepped back inside. Two officers entered the room with their guns drawn yelling commands at him. He did not give his name because he was on probation and did not want to go to jail.

He claimed that, as he was being handcuffed, officers were searching the room. He denied any of the articles of clothing or contraband in the room belonged to him. He also denied that the cell phone containing the text messages was his and claimed he had not noticed the methamphetamine pipe on the coffee table. He explained he was booked under the name Paul Amaro because he was afraid he would go to jail for his probation violation if he gave his real name. So when officers asked if that was his name, he simply said yes. He admitted he falsely said "no" when officers asked if he was on probation, and he was willing to lie to avoid going to jail.

He acknowledged having fraudulent identification cards so he could pass as Paul Amaro and avoid his probation violation. He believed no such person had the name Paul Amaro with the same birth date and address, and he believed the other identities on the

5

cards with his photograph were fictitious. He acknowledged that one of the credit cards found in the room bore the name Paul Amaro, but he denied knowing it existed until after his arrest. He was unaware of anyone else who used the name Paul Amaro but acknowledged it was not a coincidence that on two cell phones recovered from the room the name Paul Amaro appeared on a credit card. He did not know who made the false identification cards but admitted Golchini gave them to him.

Appellant further admitted that, in a recorded conversation with his girlfriend while he was in jail, he said he was "out the window" and was "going to go off," but claimed he was only joking. He also said his girlfriend was joking when she said, "like a fricking parachute." He claimed he was joking when he said he tied a sheet to the window. He asked if "Roxy" was "busted first" because "if she got busted first, then she said something about me because I was there by myself if she got busted." He also said "there was product in the room" but that "it don't even matter. It wasn't even my room anyways, you know what I'm saying?" He said that whoever Roxy calls, that person needed to tell her that the "most they can do to her is like give her four months or less. Nothing else. They need to tell her that. They need to say that everything there is hers." He acknowledged he could be facing a more serious sentence than Golchini because of his criminal history.

In a recorded conversation with another woman, appellant again asked what time Golchini had been arrested. He said someone "needs to somehow some way get a message to you know who, Roxy, and let her know that, umm, I don't know what she's trying to do with this case or whatnot because she needs to get fucking—get all the responsibility."

At approximately 2:30 p.m. on the same day appellant was arrested, Golchini was arrested in the lobby of Casa 425 for a series of thefts in Claremont during the previous month. She had eight debit cards, some gift cards, and three cell phones in her purse. She told police she was driving a Ford Fiesta, which had been registered to room 312 when she checked in the day before. There was a receipt inside her car for another hotel for a one-night stay the previous night.

6

**DISCUSSION**

*1. Search of Hotel Room*

Appellant claims his Fourth Amendment rights were violated by the officers' warrantless entry and search of the hotel room he occupied, and that the trial court erred in denying his motion to suppress the evidence seized, all of which was tainted by the officers' initial illegal entry and search. The trial court concluded he lacked both an actual and a legitimate expectation of privacy in the hotel room in order to object under the Fourth Amendment, and even if he had a reasonable expectation of privacy, the exigent circumstances, plain view, and protective sweep exceptions to the warrant requirement applied. We agree appellant lacked a legitimate expectation of privacy in the hotel room in order to object to the entry and search, so we need not address the propriety of the search itself. We limit our discussion accordingly.

*A. Proceedings*

Appellant filed a pretrial motion to suppress all the evidence seized from the hotel room pursuant to section 1538.5[2] and a supplemental motion to quash and suppress. The trial court held a lengthy hearing, during which Mangan, Detective Reyes, Golchini, Officer Snyder, and Officer Ting testified. The court also listened to audio recordings of the officers' conversations at the scene, read the corresponding transcripts, read the preliminary hearing transcript, and listened to the audio recordings of appellant's jail conversations.

As relevant to the privacy issue, Mangan testified when she checked the hotel registry on the morning of August 22, 2013, she recognized Golchini's name from a previous stay, during which Golchini had damaged the room. A month after that stay the hotel had been notified that Golchini had used a fraudulent credit card. A local merchant had also notified the hotel that Golchini had used a fraudulent credit card at that business. The hotel had reported the incident to the police. When Mangan saw Golchini's name on

---

**2**    As relevant here, section 1538.5 enables a defendant to "suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure" if "[t]he search or seizure without a warrant was unreasonable" and permits the trial court to receive evidence necessary to make such a determination. (§ 1538.5, subds. (a)(1)(A), (c)(1).)

August 22, 2013, she contacted the Claremont police department, suspecting Golchini may have used a fraudulent card again. She intended to have Golchini ejected from the hotel as a result of the prior fraudulent transaction. Golchini was the only person registered for the room but the hotel generally permitted guests to have overnight visitors without registering them. While Golchini's credit card was successfully preauthorized for her August 21, 2013 stay, on the prior occasion when Golchini had used a fraudulent credit card, the fraud had not been discovered until there was a later dispute over the charge.

Golchini testified she rented the room at Casa 425 but had no intention of staying there. She did not initially rent the room for appellant, but when she ran into appellant later that night, she decided to let him stay there and gave him a key card to the room. She did so in exchange for appellant supplying her fraudulent credit card numbers for other purchases. She had none of her possessions in the room and she had a room at a different hotel. She did not register appellant as a guest at Casa 425. She testified she would give appellant her prepaid card and he would upload money to it, use it for his expenses, and give her the money left over. She pled guilty to using a fraudulent credit card for her prior stay at Casa 425 and admitted appellant had given her that card.

Officer Snyder testified to comments reflected in audio recordings of the officers' entry into the hotel room. One officer asked appellant whose room it was, and appellant said, "I don't know." At the time, appellant also refused to give officers his name or identification.

In a lengthy ruling recited on the record, the trial court denied the motions. On the privacy issue, which the court treated as an issue of "standing," the court set forth the applicable law and held appellant failed to carry his burden of showing either an actual or legitimate expectation of privacy in the hotel room:

"Here when the defendant was confronted by the police, he stated he did not know whose room he was in. That is uncontradicted. He was asked numerous times about his identity, what's your name, where is your I.D. and each time he stonewalled, that is, he refused to answer the questions.

8

"The police were faced with a circumstance in which they had an individual in a hotel room who said he didn't know whose room it was. He refused to give a name. He refused to identify himself. The court finds that he did not exhibit a subjective expectation of privacy. Based on the totality of the circumstances coupled with his unequivocal denial that he knew who was in the room, he demonstrated that he didn't have a subjective expectation of privacy that was objectively reasonable.

"Any reasonable person would have asserted their rights. This is my room. My friend told me I could stay here. This isn't my room, but it is—you all call her Roxy—this is Roxy's room. She's my friend. He did not do so. Therefore, he does not have standing.

"However, I also think it's uncontradicted, and I'm finding it to be so that Roxanne Golchini did say and did indicate that she permitted the defendant to stay in her hotel room. Now, assuming for the sake of argument that was sufficient to preliminarily indicate some standing, the court would still have to find that there is no standing even though there may be an indication and as for the following reason.

"Ms. Golchini a month before using the same credit card she used on this occasion went in, defrauded the innkeeper. She—and I'll get into this more a little bit. But she defrauded other businesses in the area. She came back. She has no source of income other than the money tree that she found, and she testified to, and that is, whenever she ran out of money, she went back to the defendant who filled up her card, and she went out on her merry way and bought things.

"It's clear to me that she was aware that the defendant was putting illicit funds on her card, and when she rented the room, she was defrauding the innkeeper. And by defrauding the innkeeper, she has no expectation of privacy. If she doesn't, the defendant doesn't. The court is finding that she used a fraudulent credit card to rent the room, and for that reason alone she had no expectation of privacy.

"Again, the uncontroverted testimony is that Roxanne Golchini rented room 312 at Casa 425 hotel for one night. She did not check in the defendant. This was a hotel, and the length of stay, as I just said, was one night. Ms. Golchini was simply a guest of the hotel and merely had a license to use the premise[s]. She was not a tenant.

9

"While she could invite people to her room under normal circumstances, any right, particularly any privacy rights that she had—strike that, that any overnight guest may claim flows from her.

"To give—for example, the defendant's parents were here in court. They've been very polite. They've sat in the back. If they rented a hotel room, they used a credit card that was good, they invited their son to stay with them, he would have an expectation of privacy in that room.

"However, once the hotel discovered who Ms. Golchini was, the fact that she had defrauded them previously, within 30 days, it seems, that the assistant manager was also aware that Ms. Golchini had used the credit cards on her prior stay, that she had used a fake credit card to make purchases at other businesses, she was also aware the police were looking for Ms. Golchini, the assistant manager as the agent for the hotel had far more than just cause to terminate Ms. Golchini's license to use the premise[s] and cause her eviction.

"Since Ms. Golchini, as I've already discussed, committed several recent criminal acts that were known to Ms. Mangan, who is the assistant manager—and an innkeeper must take reasonable steps to prevent unlawful activity on the hotel's property—Ms. Mangan had just cause to enlist the aid of the police in evicting Ms. Golchini, and, in fact, it seems to be quite prudent when faced with somebody who was involved in criminal activity not to go up and confront them yourself as a civilian but to allow the police to do that.

"And I want to point out, and I think this is important for the rest of the discussion, and that is, as far as anybody knew, it was Ms. Golchini who was in the room. The defendant wasn't known to anybody. So once the decision to evict had been made and the request made to the police, the court finds that any privacy rights that Ms. Golchini had and through her, the defendant, went away.

"A guest, unlike a tenant, is not entitled to receive a notice to quit, that is, a notice to leave. They're not—prior to being evicted, a guest may be summarily evicted for just cause. The court has already found the evidence has proven the hotel had far more than just cause to evict Ms. Golchini. Therefore, the innkeeper and the police had every right to go to room

10

312 and enter the room to evict Ms. Golchini. For these reasons as well, the court finds the defendant did not have standing."

The court also found that appellant and Golchini were "crime partners," explaining that Golchini "has no source of income other than the money tree. What I meant by that was that she would go to the defendant. He would fill up her card. She would go out, spend it away. She would go back, and he would fill it up again.

"Therefore, when Ms. Golchini rented the room, and I do believe her when she said she rented the room initially for herself, she had no legitimate expectation of privacy in the room or an expectation of privacy that society is prepared to recognize since she was defrauding the innkeeper from the very beginning. And I do believe her when she said that she—when [appellant] said I need a place to stay, that she said, stay at the hotel because in exchange for all the money he keeps putting on her credit card.

"And for the same reason he never had an expectation of privacy from the very beginning because the court finds he knew that Ms. Golchini was using fraudulent credit cards."

The court also noted that appellant locked the door as a precaution to maintain his privacy, but the "great weight of the circumstances clearly mitigate against him in determining whether or not he really believed he had an expectation of privacy."

The court further ruled that, assuming appellant had a reasonable expectation of privacy in the hotel room, exigent circumstances justified the warrantless entry in light of appellant's attempt to climb out the window, and both the protective sweep and plain view exceptions justified the search and seizure of evidence prior to obtaining a warrant.

*B. Analysis*

"'Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal code section 1538.5 only if exclusion is mandated by the federal Constitution.' [Citation.] The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures." (*People v. Bryant* (2014) 60 Cal.4th 335, 365 (*Bryant*).) Although the trial court treated the Fourth Amendment issue as one of "standing," "the better analysis forthrightly focuses on the extent of a particular defendant's

11

rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." (*Rakas v. Illinois* (1978) 439 U.S. 128, 139 (*Rakas*).) The key question is "whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." (*Id.* at p. 140.)

To determine whether a search was unreasonable, "we ask two threshold questions. First, did the defendant exhibit a subjective expectation of privacy? Second, is such an expectation objectively reasonable, that is, is the expectation that one society is willing to recognize as reasonable?" (*People v. Camacho* (2000) 23 Cal.4th 824, 830-831.) Both questions are critical because "[t]he Fourth Amendment protects only a reasonable expectation of privacy, which 'by definition means more than a subjective expectation of not being discovered.' [Citation.] '[S]ubjective expectations of privacy that society is not prepared to recognize as legitimate have no [Fourth Amendment] protection.'" (*People v. Munoz* (2008) 167 Cal.App.4th 126, 131 (*Munoz*).) As the United States Supreme Court has explained, "a burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' [H]is expectation is not 'one that society is prepared to recognize as "reasonable."'" (*Rakas, supra*, 439 U.S. at p. 143, fn. 12; see *Munoz, supra*, at p. 131 [quoting same].)

In assessing whether an expectation of privacy is legitimate, we look to the totality of the circumstances, including "'''''whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion[;] whether he took normal precautions to maintain his privacy[;] and whether he was legitimately on the premises.'''''" (*Bryant, supra*, 60 Cal.4th at p. 365.) The defendant bears the burden to establish a legitimate expectation of privacy in the place searched. (*Ibid.*) We review the trial court's resolution of factual issues for

12

substantial evidence and the court's application of law to the facts de novo. (*Id.* at pp. 364-365.)

A defendant may have a "legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." (*Rakas, supra*, 439 U.S. at p. 142.) That includes a hotel room in which the defendant has a reasonable expectation of privacy. (*Stoner v. California* (1964) 376 U.S. 483, 490; *People v. Parson* (2008) 44 Cal.4th 332, 345; see *United States v. Bautista* (9th Cir. 2004) 362 F.3d 584, 589.) But a defendant who obtains a hotel room by intentional fraud does *not* have a legitimate expectation of privacy in that room. (See *People v. Satz* (1998) 61 Cal.App.4th 322, 326 (*Satz*).) In *Satz*, for example, the defendant used a stolen credit card to register for a hotel room. When the hotel manager discovered the fraud the next day, she called the police and asked them to assist in the defendant's eviction. She took a police officer to the defendant's room and announced their presence, but the defendant did not open the door. The manager used a key to open the door and found the defendant and two others inside. The defendant said she had no money to pay for the room and gave the officer consent to search the room. (*Id.* at p. 324.) The Court of Appeal found the defendant had no legitimate expectation of privacy in the room due to her fraud. Although the hotel room door was closed and locked, the defendant was a trespasser with "no legitimate expectation of privacy in the room, or 'an expectation that society is prepared to recognized as reasonable.'" (*Id.* at p. 326; but see *Munoz, supra*, 167 Cal.App.4th at pp. 132-134 [distinguishing *Satz* and finding defendant had a legitimate expectation of privacy in hotel room after paying for room with counterfeit bill because she was *unaware* the bill was counterfeit and the hotel had not taken steps to evict defendant before officers entered the hotel room].)

We question the trial court's finding that appellant had no *subjective* expectation of privacy based on his refusal to reveal his identity to police and his statement that he did not know who rented the room. Generally, giving information to officers that is inconsistent with a later assertion of privacy does not defeat a legitimate expectation of privacy unless the defendant *affirmatively disclaims* ownership or association with the place searched and

13

the items seized. (Compare *People v. Allen* (1993) 17 Cal.App.4th 1214, 1222-1223 [giving officers a different home address, without more, did not preclude defendant from establishing a reasonable expectation of privacy in the home searched] with *People v. Stanislawski* (1986) 180 Cal.App.3d 748, 757 [no privacy interest after defendant disclaimed any proprietary or possessory interest in campsite searched and items seized] and *People v. Dasilva* (1989) 207 Cal.App.3d 43, 48-49 [no privacy interest after defendant disclaimed ownership of items in trunk other than guitar case].) Appellant's lie that he did not know who rented the room and his refusal to identify himself were far from an affirmative disclaimer of any interest in the room.

In any case, even if appellant had a subjective expectation of privacy in the room, he had no *legitimate* expectation of privacy there. The trial court correctly reasoned that appellant's right to occupy the hotel room was derivative of Golchini's right, given he was not registered with Casa 425 and was in the room only as Golchini's guest. And Golchini's right to occupy the room was terminated when Mangan called the police to have her evicted due to her prior fraud on the hotel and area businesses. Like the defendant in *Satz*, who had no reasonable expectation of privacy after using a fraudulent credit card and the hotel sought to evict her, here Mangan knew about Golchini's prior fraud on the hotel and, immediately upon discovering Golchini had again registered at the hotel, Mangan called the police with the intent to evict Golchini from the room. Officers then went to the room to evict her, but found appellant there instead. Because appellant was not registered with the hotel but was Golchini's guest, and Golchini was validly subject to eviction from the room, appellant also was subject to eviction and had no reasonable expectation of privacy in the room. The trial court therefore properly denied appellant's motions to suppress.

## 2. *Sufficiency of the Evidence of Burglary*

For appellant's second degree burglary charge, the jury was instructed that the prosecution had to prove beyond a reasonable doubt appellant "intended to manufacture counterfeit access cards" when he entered the hotel. Appellant claims insufficient evidence supported this intent element, so his conviction for second degree burglary must be set aside as a violation of his constitutional rights. We disagree.

14

In addressing constitutional challenges to the sufficiency of evidence, "'we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.] 'The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Ramirez* (2006) 39 Cal.4th 398, 463.) As relevant here, "[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.] 'Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Citing his own testimony, appellant argues the evidence showed only that he entered the hotel room to take a shower and get some sleep. But he ignores the overwhelming circumstantial evidence contradicting his testimony. He was the only one found in a room full of fraudulent access cards, blank cards, and the instrumentalities to create counterfeit access cards. Although Golchini had rented the room, it contained only articles of men's clothing and men's toiletries, and no female clothing or toiletries were found except for a woman's hair clip. There was also evidence that Golchini rented a room at another hotel that same night. Three recovered cell phones contained photographs of appellant, as well photographs of Visa cards in various names, and photographs of handwritten notes. In two of the cell phones the name Paul Amaro appeared on a credit card, the false name appellant admitted he used and had given to police at his arrest. The phones also contained text messages between "JonJon" and "Me" containing references to credit cards; at one point, "Me" wrote, "Remember my name is Paul Amaro." A brown wallet contained three identification cards bearing appellant's photograph, two of which had the same driver's license number, and one of which had the name Paul Anthony Amaro.

Further, appellant was recorded saying "there was product in the room" but that "it don't even matter. It wasn't even my room anyways, you know what I'm saying?" He was

15

also concerned whether Golchini was arrested first because "if she got busted first, then she said something about me because I was there by myself if she got busted." He was also recorded saying that whoever Roxy called, that person needed to tell her that the "most they can do to her is like give her four months or less. Nothing else. They need to tell her that. They need to say that everything there is hers." He knew he could face a more serious sentence than Golchini because of his criminal history. In another recorded conversation, he again asked what time Golchini had been arrested and said that someone "needs to somehow some way get a message to you know who, Roxy, and let her know that, umm, I don't know what she's trying to do with this case or whatnot because she needs to get fucking—get all the responsibility." Appellant also attempted to escape the room when officers arrived and gave officers a false name when he was arrested.

Thus, substantial evidence supported appellant's burglary conviction.

### 3. *Exclusion of Officers' Audio Recordings*

Appellant claims the trial court erred in prohibiting him from impeaching the officers with recordings from the personal recording devices they were wearing when they entered the hotel room, thereby violating his rights to confrontation and due process. We disagree.

During trial, the court prohibited the parties from mentioning the recordings from the officers' personal recording devices when they entered the hotel room unless the parties obtained prior permission to do so. On cross-examination, defense counsel asked Officer Snyder if he had an audio recorder when he entered the hotel room, and he responded he did. The prosecutor objected on relevance grounds. The court allowed the answer to stand but told the defense attorney to "move on."

During a break in the cross-examination of Detective Reyes, appellant asked permission to introduce the recordings, arguing they demonstrated the officers searched the room before obtaining a warrant, which was inconsistent with their claims that they saw only three items in plain view. The court denied the request, finding the recordings had no probative value under Evidence Code section 352. The court viewed defense counsel's argument as going to the motion to suppress that was already decided and found no probative value in impeaching the officers because appellant did not claim they planted

16

evidence or fabricated any incriminating statements by appellant. The court also noted the recordings contained "foul language" and "other jocular" that had no probative value.

Later, during appellant's cross-examination, the prosecutor asked him if he answered "no" when an officer asked if he was on probation. Appellant responded that he did not say anything. The prosecutor then showed him a copy of the transcripts of the officers' recordings and appellant acknowledged he had, in fact, responded no when officers asked him whether he was on parole or probation.

A defendant has a constitutional right to cross-examine witnesses, but that right is subject to reasonable limits based on concerns of harassment, confusion of the issues, or relevance. (*People v. Pearson* (2013) 56 Cal.4th 393, 455; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) Moreover, a trial court's reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value generally does not contravene a defendant's constitutional rights to confrontation and cross-examination. (*Pearson, supra*, at p. 455.) We will not disturb the trial court's exercise of discretion under Evidence Code section 352 unless the trial court acted in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

We find no abuse of discretion and consequently no violation of appellant's constitutional rights. Appellant has not demonstrated how the audio recordings impeached Detective Reyes's trial testimony or, if they did, how Detective Reyes's credibility was relevant to any issues of consequence to the action. Appellant did not dispute that officers found various items in the hotel room or what those items were; nor did he argue officers planted evidence, altered the items found, or falsely attributed statements to him. Instead, the primary issue at trial was whether the items in the room belonged to him. If the audio recordings contradicted Detective Reyes's explanation of how the room was searched or how the items were seized, it would have had no impact on that issue. We agree with the trial court that appellant was simply attempting to relitigate the motion to suppress that had been decided against him. Given the recordings' "foul language" balanced against their minimal probative value, the trial court acted well within its discretion in excluding them

17

under Evidence Code section 352 and did not violate appellant's confrontation and due process rights by doing so.

Appellant also complains the trial court improperly allowed the prosecution to impeach him with the audio recordings.  Obviously, he cannot claim this violated his confrontation clause rights, and he does not argue it violated his due process rights.  To the extent he claims the trial court erred under state law, he forfeited this argument by not objecting at trial.  (*People v. Chism* (2014) 58 Cal.4th 1266, 1293.)

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

18